Sixth Division
September 30, 2010

No. 1-08-1885

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County |
| | ) | |
| v. | ) | 07 CR 17333 |
| | ) | |
| BRYANT JONES, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | John P. Kirby, |
| | ) | Judge Presiding. |

JUSTICE McBRIDE delivered the opinion of the court:

Following a bench trial, defendant, Bryant Jones, was found guilty of first degree murder and sentenced to 22 years' imprisonment. On appeal, defendant contends that the State failed to prove him guilty beyond a reasonable doubt. For the reasons that follow, we reduce defendant's conviction and remand for resentencing.

Defendant was arrested and charged with two counts of first degree murder. Count I alleged that defendant intentionally and knowingly asphyxiated the victim, Michael Howell, with his foot, while count II alleged that defendant asphyxiated and killed Howell with his foot, knowing that such act created a strong probability of death or great bodily harm to the victim.

The following evidence was presented at defendant's trial.

Jasmin Reyes testified that she met defendant in 1994 and that they had two children together. In April of 2007, Reyes and defendant were dating and Reyes was living with her brother and his wife while defendant lived in a separate apartment with the couple's children. Reyes met Howell at the Target store where they both worked. In early 2007, Reyes and Howell,

who was married at the time, began to have a sexual relationship. Reyes and Howell were both working on April 9, 2007, and sent each other text messages throughout the day about meeting after work. When Reyes said she did not have money to go anywhere, Howell suggested that they go to defendant's apartment.

Reyes and Howell traveled to defendant's home in separate vehicles. Reyes testified that she did not have to tell Howell how to get to defendant's apartment because she and Howell had met there on a previous occasion in order to have sex. According to Reyes, Howell "knew the situation I was in" and knew that the apartment belonged to defendant. Reyes arrived at defendant's home at approximately 5:15 p.m. and Howell arrived approximately 15 minutes later. Reyes described defendant's home as a two-bedroom attic apartment above a single-family home. The apartment had only one entrance and exit, which was accessed by a stairway attached to the rear of the building.

Reyes testified that she did not have a key to defendant's apartment but that she knew where he kept his spare key. When Howell arrived at the apartment, he and Reyes immediately had sex on defendant's bed. About 20 minutes later, as they were preparing to leave the apartment, Reyes looked out the back window and saw defendant in the backyard putting his dog into a pen. Reyes was confused because she did not expect defendant to be home until 10 p.m. She told Howell to hide in the children's bedroom.

Defendant entered the apartment and asked Reyes what she was doing there and how she got into the apartment. Reyes unsuccessfully tried to pick a fight with defendant in order to get him to leave. Defendant then went to the bathroom and when Reyes thought she heard him turn

on the shower, she went to the children's bedroom and told Howell to leave. Howell left the bedroom but was delayed leaving the apartment because he tried to push instead of pull on the apartment door. As Howell and Reyes were standing at the door, defendant exited the bathroom, looked at Howell, and said, "who the f*** are you?" Howell responded that he "didn't know [Reyes] was with someone," and Reyes said, "let me explain." Reyes was standing between defendant and Howell at this point and then Howell opened the apartment door, pushed Reyes into defendant, and ran outside. Defendant caught Reyes, put her to the side, and followed Howell out of the apartment. According to Reyes, neither Howell nor defendant touched each other while they were inside defendant's apartment.

When the two men were outside, Reyes, who had remained in the apartment, heard Howell tell defendant that he was a police officer and defendant asked to see Howell's badge. Reyes testified that Howell was lying about being a police officer. Reyes began to look for her cell phone inside the apartment until she heard defendant and Howell "yelling" outside. Reyes ran outside and, upon reaching the bottom of the stairs, saw defendant and Howell on the ground near the gangway. Reyes explained that "[Howell] was on the ground on the side, [and defendant] was coming off of him." She further explained that Howell "was laying down diagonally" and defendant "was on top of him" getting up off of Howell's stomach. Howell was not moving at the time but Reyes could hear that he was still breathing. When defendant stood up, he told Reyes to take him to his children. Reyes stepped over Howell and, as she glanced back, saw that he was still breathing and that his lips were "shivering." Reyes and defendant then drove to pick up their children and went to dinner. Reyes later drove to the police station

3

1-08-1885

with defendant.

The State's next witness was Marcos Cervantes, who lived in the same building as defendant. Cervantes described the house as a single-family home with a gangway next to the house that led to the backyard. The backyard consisted of a cement area and a staircase leading up to an attic apartment. Cervantes stayed in the basement of the house while his mother and daughters resided on the first floor. Defendant lived in the attic apartment with his two children.

Cervantes testified that on April 9, 2007, defendant arrived at home with one of his friends at approximately 5 p.m. Defendant, his friend, and Cervantes then left to walk their dogs at a nearby park. Upon returning home, defendant's friend left and defendant went upstairs to his apartment, telling Cervantes that he was going to feed his dogs and take a shower. Cervantes remained in the backyard playing with his dogs. After some time, Cervantes heard defendant yell that someone was in his house. Cervantes looked up to the top of the staircase and saw defendant "fall towards the side a little bit." Cervantes tried to contain his dogs because they were barking and were "really riled up." As defendant descended the stairs, Cervantes saw defendant's arm outstretched as if he was "grabbing for something." Cervantes did not hear any sounds or see who was in front of defendant because he was trying to control his dogs. Cervantes put one of his dogs in the pen and took the others to the gangway to put them in the basement. As he was doing so, Cervantes saw defendant and an unknown man, whom he identified as Howell, coming toward him by the back door. Defendant and Howell were pushing each other and it appeared to Cervantes that defendant was holding Howell back and that Howell was pushing defendant in order to get past him and leave the backyard. Defendant was punching

4

1-08-1885

Howell in the head with both of his fists and when asked by the prosecutor if defendant could have punched Howell in the head more than five times, Cervantes said yes. Howell was "swinging" or "flapping" his arms but Cervantes did not see Howell hit defendant.

Cervantes further testified that at some point defendant hit Howell in the face, causing him to spin around and fall to the ground. After Howell fell to the ground, defendant "stood over" Howell and punched him in the head a "couple more times" and kicked him in the head, although Cervantes did not recall how many times defendant did so. Cervantes pushed defendant off of Howell and said "that was enough." Defendant stopped punching and kicking Howell, stood up, and asked Cervantes "why, do [you] know him?" Cervantes told defendant that he did not and that he was calling the police. Defendant then put his left foot between Howell's "chest and his head" and "held [Howell] down." Cervantes characterized defendant's actions as "standing there" and "holding [Howell] down" by pressing his foot "anywhere between the upper chest and by his head." When asked if defendant's foot was between Howell's chin and upper chest, Cervantes testified that "[Howell] was kind of big, so I couldn't get to see [defendant's] foot." When asked if defendant used his foot in a "quick movement like a kick" or if he "held it there," Cervantes responded that defendant "held it there" but by that time Cervantes was turning around to call the police and he did not know how long defendant held his foot in that position. Defendant eventually took his foot off of Howell and, according to Cervantes, Howell's lips were moving, he was not choking, and he was still breathing at this time. Cervantes thought that Howell had been "beat up," and so he put a garden hose by Howell's mouth and, according to Cervantes, it "looked like [Howell] took a little bit" of water. Cervantes then told Howell to

5

remain still because the police were on their way. Defendant was not at the house when the police later arrived.

A paramedic testified that he arrived at the scene at approximately 6:30 p.m., and found Howell lying face down in the gangway. He had no pulse and was confirmed to be dead.

Detective Daniel Gorman of the Chicago police department arrived at the scene at approximately 7:30 p.m. The detective observed blood and vomit coming from Howell's nose and mouth. The detective spoke with Cervantes and, based upon that conversation, began to look for defendant and Reyes. The detective later learned that defendant had gone to the police station and been arrested there. Detective Gorman met with defendant at Area One headquarters at approximately 11 p.m. The detective noticed defendant was limping but he refused medical assistance and said he hurt himself playing softball. At the police station, defendant said that he was 5 feet 11 inches tall and weighed 240 pounds. Detective Gorman did not observe any cuts, abrasions or blood on defendant.

Chicago police officer Richard Turrise was also involved in the investigation into Howell's death. Officer Turrise went to defendant's previous address and spoke with defendant's mother, who in turn telephoned defendant and put him on the phone with the officer. Defendant said that he would come to his mother's house but he did not do so. The officer again spoke to defendant on the telephone and, after that conversation, the officer put out a description of defendant and advised that defendant was in the vicinity of the 8th district police station. When the officer arrived at that station, defendant was already in custody. Officer Turrise testified that when he saw defendant at the police station, he did not observe any marks, bruises

or abrasions on defendant's face or arms. The officer also identified defendant's booking photograph and testified that there were no marks or blood on defendant's face.

Dr. Michael Humilier, a deputy medical examiner at the Cook County medical examiner's office, performed an autopsy on Howell on April 10, 2007. Based upon the results of that autopsy, Dr. Humilier testified that in his opinion, within a reasonable degree of medical certainty, Howell died of asphyxia due to compression of the neck from an assault and the cause of death was homicide.

Dr. Humilier testified that at the time of his death Howell was 30 years old, 5 feet 9 inches tall, and weighed 370 pounds. Dr. Humilier's examination revealed a number of injuries to Howell, all of which occurred within 24 hours of the autopsy. Specifically, Howell suffered petechial hemorrhages to his left and right lower eyelids as well as to his lower lip and the front of his neck and upper chest. Petechial hemorrhages are pinpoint hemorrhages that are caused when blood flowing to the brain is obstructed. When this occurs, blood that is already in the brain increases in pressure and causes pinpoint hemorrhages in the blood vessels. Petechial hemorrhages are commonly found in people who suffer from asphyxia, which is the exclusion of oxygen from the brain by a number a number of different mechanisms, including depression of the neck. The doctor testified that the hemorrhages on Howell's neck and chest were consistent with compression having been applied to the front area of his neck and chest.

Dr. Humilier further testified that it requires 4.4 pounds of pressure to a person's jugular vein to cause that person to asphyxiate. In contrast, it requires up to 11 pounds of pressure to the carotid artery, 33 pounds of pressure to the windpipe, and 66 pound of pressure to the vertebral

arteries that run in the spinal column to cause asphyxiation. The doctor explained that direct pressure to the jugular vein or carotid artery is not required in order to cause asphyxiation. Rather, as long as the requisite pressure is applied to the soft tissues of the front or side of the neck, those soft tissues would put pressure on and ultimately block the jugular vein and carotid artery and cause asphyxiation. Dr. Humilier testified that in this case, it would have required a minimum of 4.4 pounds of pressure to cause Howell to asphyxiate by compression of his jugular vein resulting from someone standing up and applying pressure to the area of Howell's neck.

Dr. Humilier also observed other external injuries to Howell's body. These included a bruise on the left side of Howell's neck which measured 3 by 1 ½ inches. This bruise was consistent with pressure having been applied to that area of Howell's neck. Other external injuries included lacerations to Howell's lips and abrasions and bruises on his body, head and hands. The bruises and laceration to the lips were consistent with Howell having been punched or kicked in the head. Dr. Humilier's internal examination of Howell revealed subgaleal hemorrhages to the right and left side of the scalp as well as swelling of the brain. The subgaleal hemorrhages were consistent with Howell having been kicked or punched in the head.

On cross-examination, Dr. Humilier testified that "[n]one of the abrasions, lacerations or bruises" that Howell received, either individually or collectively, caused his death. When asked whether Howell "die[d] from the fight," the doctor responded that he did not. Dr. Humilier also testified that the bruises and lacerations were consistent with Howell having fallen face first onto the concrete. Moreover, the doctor testified that even 4.4 pounds of pressure would have caused Howell to asphyxiate and that this amount of pressure could have been applied by someone using

his foot to hold Howell down by his neck during the course of a fight. Under these circumstances, it would have taken one minute of pressure to cause Howell to asphyxiate. Moreover, if the foot was removed and Howell's lips were still moving, that did not necessarily mean that asphyxiation had not been completed. The quivering lips could have simply been caused by the muscles in the lips contracting and expanding as Howell died.

The State then rested its case and the trial court denied defendant's motion for a directed finding. Defendant testified on his own behalf. According to defendant, he left the tattoo parlor where he worked at 3:30 p.m. on April 9, 2007, and went to walk his dogs with Cervantes and another friend. Upon returning home, defendant left his dog with Cervantes and went upstairs to his apartment. As he entered his apartment, Reyes came toward him and asked why he was home. Defendant told her that he was going to freshen up and that they would then take their children to dinner.

Defendant was in the bathroom washing his hands when he noticed that Reyes was no longer responding to him. He stepped out of the bathroom and saw an unknown man, whom he identified as Howell, standing at the apartment door. Defendant said "who the f*** is this" and then walked toward Howell and Reyes. Defendant opened the door and asked Cervantes if he saw anyone come up to the apartment after defendant. Cervantes said that he had not. Defendant returned to the apartment and again asked Reyes who Howell was. Reyes did not respond. Howell then pointed at defendant, said "it is your fault," and pushed defendant with his finger. Howell then pushed Reyes into defendant and ran out of the apartment. Defendant caught Reyes, put her to the side, and ran outside after Howell. Defendant caught up with Howell in the

9

backyard and Howell said, "you don't want to mess with me, I am a cop." Defendant asked Howell to show him his badge and Howell reached into his pocket. Instead of pulling out a badge, however, Howell swung at defendant.

Defendant testified that he was "scared," that he "lost control," and that he swung back at Howell to defend himself. The two men then began to fight. Defendant did not remember how many times he hit Howell, he "just remember[ed] punching and punching" because he was scared and because Howell was a "big dude" whom he did not know. Defendant "just kept swinging" because Howell had swung at him until, at some point, Howell grabbed his face and fell to the ground. Defendant then "got on top of him holding him down so that he couldn't leave." Cervantes approached him and said "that is enough," at which point defendant got up and asked Cervantes if he knew Howell. Cervantes responded that he did not. Cervantes then called the police to report a burglary and defendant told Reyes, who had just come down the stairs, that they needed to talk. They walked to the car and left. According to defendant, Howell was still breathing at that point and defendant assumed that he would live. Defendant and Reyes picked up their children from day camp and took them to dinner. Several hours later, defendant turned himself into the police.

On cross-examination, defendant testified that he returned to the apartment after asking Cervantes if anyone had followed him upstairs in order to find out who Howell was. Defendant acknowledged that after he chased Howell out of the apartment but before Howell swung at him, he jumped in front of Howell and blocked his path out of the gangway. Defendant also acknowledged that Howell never hit or injured him during the fight. Defendant did not recall

punching or kicking Howell in the head after he fell to the ground, but defendant did recall "holding Howell down" so that he could not get up. Defendant did not remember using his foot to do so, however. Instead, he explained that he held Howell down in the following way: "He was on the ground, was trying to move. I kept him down. I had my hand on the ground and I had him placed between, not my hand on ground [*sic*] and he was down on the ground between my knees and my legs." Defendant got up from the ground when Cervantes told him to stop and, at that point, Howell was still breathing and defendant did not think there was "any chance" of Howell getting up and coming after him because Howell was "out of it" and "losing consciousness."

The trial court found defendant guilty of both intentional and knowing murder. In doing so, the court rejected defendant's assertion that he and Howell were engaged in mutual combat. The court credited Reyes' testimony that Howell never touched defendant in the apartment and Cervantes' testimony that Howell did not hit defendant during the struggle and that Howell tried to leave the backyard but was prevented from doing so by defendant. The court also rejected defendant's claim of self-defense, noting that Howell did not injure or attack defendant. The court also pointed to Cervantes' testimony that defendant punched and kicked Howell and then put his foot on Howell's throat and characterized the situation as "one man trying to get out of there and another in a fit of vengeance or rage" who knew what was "going on in that apartment" and who, by his own words, "lost control." The court subsequently sentenced defendant to a term of 22 years' imprisonment. This appeal followed.

Defendant contends that the State failed to prove him guilty of first degree murder beyond

11

1-08-1885

a reasonable doubt. He argues that the evidence showed that he committed involuntary manslaughter when he recklessly caused Howell's death. Alternatively, defendant argues that the evidence supported only a conviction for second degree murder based on provocation resulting from mutual combat.

When reviewing challenges to the sufficiency of the evidence in a criminal case, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime upon which the defendant was convicted beyond a reasonable doubt. *People v. Ross*, 229 Ill. 2d 255, 272 (2008). Although the trier of fact is responsible for assessing the credibility of the witnesses and weighing the testimony, the trial court's determination is not conclusive. *People v. Smith*, 185 Ill. 2d 532, 542 (1999). Rather, we will reverse a conviction where the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of defendant's guilt. *Smith*, 185 Ill. 2d at 542.

Defendant was charged with first degree murder under sections 9-1(a)(1) and 9-1(a)(2) of the murder statute. A person is guilty of the offense of first degree murder under these sections of the murder statute when he kills an individual without lawful justification if, in performing the acts which cause the death, he intends to kill or do great bodily harm or knows that his acts created a strong probability of death or great bodily harm to that individual. 720 ILCS 5/9-1(a)(1), (a)(2) (West 2006). On the other hand, a person commits involuntary manslaughter when he unintentionally kills another individual without lawful justification and his acts which cause the death are likely to cause death or great bodily harm and are performed recklessly. See

12

1-08-1885

720 ILCS 5/9-3 (West 2006).

The basic difference between first degree murder and involuntary manslaughter is the mental state that accompanies the conduct resulting in the victim's death. *People v. DiVincenzo*, 183 Ill. 2d 239, 249 (1998). Involuntary manslaughter requires a less culpable mental state than first degree murder. *DiVincenzo*, 183 Ill. 2d at 249. The mental state for murder is knowledge, while the mental state for involuntary manslaughter is recklessness. *People v. Givens*, 364 Ill. App. 3d 37, 44 (2005). A person is said to have knowledge when he is consciously aware that his conduct is practically certain to cause a particular result. *People v. Leach*, 391 Ill. App. 3d 161, 175 (2009), citing 720 ILCS 5/4-5(b) (West 2002). A person acts recklessly when he "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow * * * and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2006). "In general, a defendant acts recklessly when he is aware that his conduct might result in death or great bodily harm, although that result is not substantially certain to occur." *DiVincenzo*, 183 Ill. 2d at 250. Recklessness therefore typically involves a lesser degree of risk than conduct that creates a strong probability of death or great bodily harm. *DiVincenzo*, 183 Ill. 2d at 250.

In *DiVincenzo*, our supreme court discussed several factors that were relevant to determining whether a defendant acted recklessly. In that case, the evidence adduced at trial established that the defendant disliked the victim because the victim had dated defendant's girlfriend several years earlier. On the day of the victim's death, the defendant became upset when, while stopped at a red light, he observed the victim staring at him from his vehicle.

13

1-08-1885

Defendant followed the victim's vehicle for some time until the victim pulled into a driveway. *DiVincenzo*, 183 Ill. 2d at 245-46. The defendant and the victim exited their vehicles and began to argue and shove each other. When the victim made a movement as though he was going to punch the defendant, the defendant slapped and punched the victim in the head, knocking him to the ground. There was conflicting testimony as to whether the defendant kicked the victim while he was on the ground. *DiVincenzo*, 183 Ill. 2d at 245-46. A witness testified that the entire incident was over "in seconds." The defendant then left the scene while the victim was left lying motionless on the ground, and the victim died later that evening. A medical examiner testified that the victim suffered a fractured and dislocated jaw, multiple bruises, and bleeding under the scalp. According to the medical examiner, the injuries suffered by the victim were consistent with blunt trauma caused by punching and kicking and the cause of death was a torn cerebral artery that resulted in a subarachnoid hemorrhage, which the medical examiner characterized as a "rare phenomenon." *DiVincenzo*, 183 Ill. 2d at 247. The defendant called two expert witnesses at trial. One testified that the hemorrhaging was due to a ruptured aneurysm, not a torn cerebral artery, which he characterized as unlikely. Defendant's other expert witness testified that a minimal amount of force was required to fracture the jaw and that a blow to the jaw does not usually cause cerebral bleeding. The expert also testified that the beating contributed to the victim's death. *DiVincenzo*, 183 Ill. 2d at 248. After the evidence was presented, the trial court instructed the jury on first and second degree murder but denied the defendant's request for an involuntary manslaughter instruction. *DiVincenzo*, 183 Ill. 2d at 248. The jury found the defendant guilty of first degree murder.

14

1-08-1885

On appeal, our supreme court found that the jury should have been instructed on involuntary manslaughter and therefore reversed the defendant's murder conviction. The court stated that "although not dispositive, certain factors may suggest whether a defendant acted recklessly and whether an involuntary manslaughter instruction is appropriate." *DiVincenzo*, 183 Ill. 2d at 250-251. These include: (1) the disparity in size and strength between the victim and the defendant; (2) the brutality and duration of the beating, and the severity of the victim's injuries; and (3) whether a defendant used his bare fists or a weapon, such as a gun or a knife. *DiVincenzo*, 183 Ill. 2d at 251. Applying these factors, the court reasoned that some evidence was presented at trial that would support a finding of recklessness and involuntary manslaughter. The court noted that there was no disparity in size and strength between the defendant and the victim, that the altercation was of a short duration, and that all three expert witnesses testified that the injury resulting in the victim's death was a rare phenomenon. The court also noted that the defendant did not use a weapon, such as a gun or a knife, and that there was disputed testimony as to whether the defendant kicked the victim while he was on the ground. *DiVincenzo*, 183 Ill. 2d at 251. The court concluded by noting that although the defendant may have deliberately provoked the confrontation, "a defendant may act recklessly where he commits deliberate acts but disregards the risks of his conduct." *DiVincenzo*, 183 Ill. 2d at 252.

In this case, it is undisputed that defendant performed the acts which caused Howell's death. The only issue is the mental state with which defendant performed those acts. Because a defendant's mental state is not commonly proved by direct evidence, it may be inferred from the surrounding circumstances, including the character of the defendant's acts and the nature of the

15

victim's injuries. *People v. Terrell*, 132 Ill. 2d 178, 204-05 (1989). Generally, the question of whether a defendant acted intentionally, knowingly, or merely recklessly is a question to be resolved by the trier of fact. *Givens*, 364 Ill. App. 3d at 44. The trial court's determination, however, is not conclusive. Rather, we must reverse a conviction where, after reviewing the evidence and giving due consideration to the fact that the trial court had the opportunity to see and hear the witnesses, we are of the opinion that the evidence was insufficient to prove defendant guilty beyond a reasonable doubt. See *Smith*, 185 Ill. 2d at 541.

The circumstances of the present case are unique. We have not found, nor have the parties presented us with, a case similar to the present one in which the victim died from asphyxiation as a result of pressure being applied from a foot. In contrast to the present case, in the majority of cases in which the victim died from asphyxiation, death was brought about by the defendant choking the victim with his hands for an extended period of time. For example, in *Leach*, 391 Ill. App. 3d at 163, the defendant was found guilty of first degree murder based upon evidence showing that he strangled his wife to death. At trial, the defendant claimed that he did not mean to kill his wife and that her death was an accident. The testimony given at the defendant's trial established that the defendant and his wife had a physical altercation in their bedroom which ultimately resulted in the defendant choking the victim for at least three minutes. *Leach*, 391 Ill. App. 3d at 176. The medical examiner testified that a person loses consciousness after 10 to 30 seconds of choking and that death results after three to six minutes of continued pressure. In rejecting the defendant's claim of recklessness and finding the defendant guilty of first degree murder, the trial court stated that based upon the amount of time defendant must have

16

choked the victim, the defendant must have known that his conduct created a strong probability of death. *Leach*, 391 Ill. App. 3d at 176. In affirming that conviction on appeal, the appellate court noted that based upon the testimony of the medical examiner and the defendant, the trial court could have concluded that the defendant must have choked his wife for a minimum of 2 minutes and 30 seconds after she lost consciousness. The court noted that, given that time frame, the trial court could have reasonably found that the defendant was consciously aware that his conduct was practically certain to result in death or great bodily harm. *Leach*, 391 Ill. App. 3d at 176; see also *People v. Tijerina*, 381 Ill. App. 3d 1024 (2008) (where the defendant was found guilty of first degree murder on evidence showing that he beat his girlfriend and choked her for three to four minutes and that the victim died as a result of strangulation and multiple blunt force trauma); *People v. Lacey*, 256 Ill. App. 3d 20 (1993) (where the defendant was found guilty of first degree murder on evidence showing that he strangled the victim with a belt for 5 to 10 minutes until she went "limp").

These cases are consistent with the general principle that "the intentional use of a deadly weapon is accompanied by a presumption the actor knows his acts create a strong probability of death or great bodily harm because a person intends the natural and probable consequences of his acts." *People v. Gresham*, 78 Ill. App. 3d 1003, 1007 (1979); *Terrell*, 132 Ill. 2d at 204. For example, in *Leach*, the court reasoned that based upon the nature of defendant's voluntary act, placing his hands on the victim's neck, as well as the nature of the force that was applied, choking the victim for three to six minutes until she was rendered unconscious and eventually dead, "the requisite mental state of knowledge can be inferred from the very nature of

17

1-08-1885

defendant's voluntary acts." *Leach*, 391 Ill. App. 3d at 177. In other words, the mental state of knowledge can be inferred based upon the fact that the natural and probable consequence of a person placing his hands on a victim's neck and choking that victim for at least several minutes is death or great bodily harm.

The present case stands in contrast to these principles and the cases discussed above such that, in this case, an inference of knowledge cannot be drawn solely on the basis of defendant's voluntary act. In the present case, unlike those discussed above, Howell's death was not brought about by defendant's use of a deadly weapon or by asphyxiation resulting from defendant placing his hands on Howell's neck and choking him for an extended period of time. Rather, the pressure that caused Howell to asphyxiate was applied by defendant's foot. Specifically, the pressure was applied when, according to Cervantes, defendant stood next to Howell and "held him down" by placing his foot between Howell's neck and chest. While it is true that defendant deliberately placed his foot in the area of Howell's neck, "a defendant may act recklessly where he commits deliberate acts but disregards the risks of his conduct." *DiVincenzo*, 183 Ill. 2d at 252.

In this respect, the trial court misconstrued Cervantes' testimony when it found defendant guilty of first degree murder. In announcing its ruling, the court pointed to Cervantes' testimony for the court's conclusion that defendant knocked Howell to the ground and then "stood on his neck." The court specifically stated:

>    "Based on the testimony of all the parties *** it seems
>
>    obvious to this Court that there was not mutual combat , there was

18

not self-defense.  And after the defendant was able to bodily punch this victim, this huge man, knock him to the ground he went further and he stood on his neck.  And he testified he doesn't remember standing on his neck or he doesn't remember kicking him but Marcos Cervantes who is the closest individual to the incident said yes that defendant Mr. Jones did both of those, knocked him to the ground, stood over him, punched him and kicked him and stood on, put his foot on the victim's throat which the doctor has described as causing the death of the victim."

Contrary to the court's statement, Cervantes, who aside from defendant was the only person to witness the altercation in the courtyard, never testified that defendant "stood on" Howell's neck.  Rather, Cervantes consistently characterized defendant's actions as "holding [Howell] down" by placing his foot between Howell's head and chest.  Specifically, Cervantes testified that after he pushed defendant off of Howell, defendant "kicked [Howell] and held him down."  When later asked what defendant was doing with his foot, Cervantes testified that defendant was "holding [Howell] down."  Although the trial court's findings of fact are given great weight, they are not conclusive where, as in this case, the finding is unsupported by the testimony given at trial.  See *Smith*, 185 Ill. 2d at 542.

We also note that there was a significant disparity in the size of defendant and Howell. While the two men were of similar height, Howell weighed 370 pounds while defendant weighed 240 pounds.  Howell therefore outweighed defendant by approximately 130 pounds.  This point

19

is also significant because the trial court clearly chose to credit Cervantes' testimony regarding defendant's actions during his altercation with Howell. If, as Cervantes testified, defendant used his foot to hold Howell down, defendant certainly would have applied some pressure to do so given the fact that Howell was a large man who outweighed defendant by 130 pounds.

Moreover, unlike in the cases cited above in which the victim was strangled for at least several minutes, the State did not establish how long defendant applied pressure to the area of Howell's neck. Cervantes testified that he did not know how long defendant held Howell down with his foot and the medical examiner did not testify as to how long the pressure was applied to the area of Howell's neck. The medical examiner did testify as to the minimum amount of pressure that would have been required to cause Howell to asphyxiate and how that pressure could have been applied. Specifically, the medical examiner testified that it would have required only 4.4 pounds of pressure to Howell's neck to cause asphyxiation by compression of his jugular vein. The medical examiner explained that, in contrast, it requires up to 11 pounds of pressure to a person's carotid arteries, 33 pounds of pressure to the trachea, and 66 pounds of pressure to the vertebral arteries that run in the spinal column to cause asphyxiation. The medical examiner further testified that the 4.4 pounds of pressure needed to cause Howell's asphyxiation could have been applied by the defendant placing his foot on Howell's neck for one minute in order to hold and keep Howell down after he had fallen to the ground. The medical examiner also explained that the pressure required to cause Howell's asphyxiation need not have been applied directly to his jugular vein. Rather, as long the requisite pressure is applied to the soft tissues of the front or side of the neck those soft tissues will put pressure on the blood

vessels and cause asphyxiation.

The evidence presented at trial does not support an inference that a layperson such as defendant knew or should have known that applying 4.4 pounds of pressure for at least one minute was sufficient to cause Howell to asphyxiate or that this pressure need not have been applied directly to the jugular vein but instead could have been applied to the soft tissue on the front or side of the neck. In addition, there is nothing in the record to suggest that defendant was aware of the various degrees of pressure that, when applied to certain parts of a person's body, will cause that person to asphyxiate.

There is no dispute that defendant and Howell engaged in a fight, and this is not surprising given the circumstances of the case. Reyes was defendant's girlfriend and the mother of his two children. On the day Howell died, Reyes knew where defendant kept his spare key and she used that key to enter defendant's apartment without his permission to have sexual intercourse with Howell. Defendant arrived home early from work and, after walking out of his bathroom, he found Reyes standing at the apartment door next to Howell. After defendant asked who Howell was, Howell pushed Reyes into defendant and then left the apartment. When defendant followed Howell outside, Howell told defendant that he was a police officer and that defendant did not want to "mess with" him. Although it appears defendant landed the only blows and the trial court rejected defendant's claim of mutual combat and self defense, the circumstances which caused Howell's death cannot be ignored.

In finding defendant guilty of first degree murder, the trial court also emphasized the fact that defendant punched and kicked Howell in the head. On appeal, the State's response to

defendant's argument of recklessness is that defendant's actions were deliberate and intentional and that defendant "savagely beat the victim to death." However, it is clear that the victim was not beaten to death. The medical examiner testified that "[n]one of the abrasions, lacerations or bruises" that Howell received, either individually or collectively, caused his death. When asked whether Howell "die[d] from the fight," the medical examiner testified that he did not.

There is a long-standing principle in Illinois that death is not ordinarily contemplated as a natural consequence of blows from bare fists. See *People v. Crenshaw*, 298 Ill. 412, 416-17 (1921); *Gresham*, 78 Ill. App. 3d at 1007; *People v. Brackett*, 117 Ill. 2d 170, 180 (1987). For example, in *Crenshaw*, 298 Ill. at 414, the defendant threatened to kill the victim and immediately thereafter struck the victim on the side of his face or head with his clenched fist and knocked him down. The victim was taken to the hospital and died within a few minutes. The defendant was found guilty of murder and our supreme court reversed that verdict and remanded the case for a new trial. The court reasoned that "[t]he defendant is presumed to have intended the reasonable and probable consequences of his act, but death not being a reasonable or probable consequence of a blow with the bare fist he is not presumed to have intended it to produce that result, and if he did not, the crime would be manslaughter and not murder." *Crenshaw*, 298 Ill. at 417.

It has also been recognized that death may be the natural consequence of blows with bare fists where there is a great disparity in size and strength between the defendant and the victim. *Brackett*, 117 Ill. 2d at 180. However, this principle is applicable when the defendant is of much greater size than the victim. For example, this principle was applied in *Brackett* to hold that a

22

1-08-1885

21-year-old, 170-pound, adult male who beat an 85-year-old woman with sufficient force to break bones could not claim that he was unaware that blows from his bare fists created a strong probability of death or great bodily harm. See *Brackett*, 117 Ill. 2d at 180. This is not the case before us. Given the disparity in size between Howell and defendant, defendant's actions in punching and kicking Howell, while certainly suggesting that defendant intended to "beat up" Howell, do not indicate that defendant acted with the intent or knowledge required for the offense of murder. Moreover, the record indicates that the entire altercation between defendant and Howell, from the time defendant discovered Howell in his apartment with Reyes until the time defendant and Reyes left the scene, was brief. Cervantes also testified that defendant stopped hitting and kicking Howell when Cervantes pushed defendant away and told him that "was enough." At that point, according to Cervantes, defendant stood up next to Howell and held him down by placing his foot between Howell's neck and chest.

Finally, although not mentioned by the trial court, defendant's actions in leaving Howell on the ground while Howell was still breathing are inconsistent with the mental state for first degree murder. The evidence presented at trial established that at the time defendant left the scene after his altercation with Howell, he had no reason to believe that Howell was going to die or that he had suffered great bodily harm. Cervantes testified that when defendant left the area with Reyes, Howell was not choking, his lips were moving, and he was still breathing. Cervantes believed that Howell had just been "beat up" and so he left a garden hose by Howell's mouth so that he could have water and told him to remain still because the police were on their way. Cervantes testified that although he was not sure, it appeared that Howell even drank some water

23

from the hose. Cervantes' undisputed testimony corroborated defendant's testimony that when he left the scene, Howell was still breathing and defendant assumed that he would live. Therefore, although the State points to the fact that defendant intentionally left the scene before the police arrived, we do not believe that this conduct demonstrates that defendant acted with the mental state required to be convicted of first degree murder. *Cf. Leach*, 391 Ill. App. 3d at 177 (where the court noted that, in response to the defendant's testimony that he performed mouth-to-mouth resuscitation on the victim after choking her for at least three minutes, "[a]lthough defendant's attempt to revive [the victim] was laudable, it also manifested an awareness that the natural tendency of strangling another human being for three to six minutes is to destroy that person's life"). And although the medical examiner testified that Howell could have already asphyxiated and that the muscles in his lips could have simply been twitching as he died, there is no basis in the record to infer that defendant would have been aware of this possibility.

We conclude that the evidence presented at trial was insufficient to establish that at the time defendant placed and held his foot in the area of Howell's neck, defendant intended to kill Howell or that he was consciously aware that his conduct was "practically certain" to cause a particular result. 720 ILCS 5/4-5(b) (West 2006). The evidence was sufficient, however, to establish that defendant acted recklessly when he placed his foot in the area Howell's neck and exerted sufficient pressure to cause Howell's death. Accordingly, under the power granted by Supreme Court Rule 615(b)(3) (134 Ill. 2d R. 615(b)(3), we reduce the degree of the offense for which defendant was convicted from first degree murder to involuntary manslaughter.

As modified, the conviction is affirmed and the cause remanded to the circuit court of

1-08-1885

Cook County with directions that a sentence be imposed for involuntary manslaughter.

Affirmed as modified and remanded with directions.

CAHILL and R.E. GORDON, JJ., concur.