2020 IL App (1st) 170319-U

No. 1-17-0319

Order filed January 10, 2020

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 07 CR 7073 |
| | ) | |
| ALLEN BLANCH, | ) | Honorable |
| | ) | Kevin M. Sheehan, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HALL delivered the judgment of the court.
Justices Rochford and Delort concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Defendant's conviction and sentence affirmed where the evidence was sufficient to prove defendant guilty of first-degree murder beyond a reasonable doubt and his conviction would not be reduced to involuntary manslaughter or second-degree murder; the trial court properly rejected defendant's request for a jury instruction on involuntary manslaughter where the evidence did not support such an instruction; defendant's 50-year sentence was not excessive when the trial court properly considered all evidence and statutory factors in aggravation and mitigation.

¶ 2    Defendant Allen Blanch appeals his first-degree murder conviction and 50-year sentence after his second jury trial.  Defendant's first jury trial resulted in a conviction for first-degree murder for the 2007 choking death of Tanisha "Nikki" Thurmond and a 50-year sentence.  This court reversed the judgment and remanded for a new trial, finding that the prosecutor and the trial judge misled the jury by telling the jury that they should not find defendant guilty of second-degree murder unless they found the circumstances justified the killing.  *People v. Blanch*, 2014 IL App (1st) 123093-U, ¶ 2.

¶ 3    On appeal, defendant contends that:  (1) the evidence was insufficient to prove him guilty of first-degree murder beyond a reasonable doubt where the evidence only proved involuntary manslaughter; alternately, defendant contends that the evidence proved second-degree murder; (2) he was denied a fair trial when the trial court refused to instruct the jury on the lesser included offense of involuntary manslaughter; and (3) his 50-year sentence is excessive given his minimal criminal history, history of alcohol and drug abuse, his remorse and his demonstrated rehabilitation since his incarceration.[1]  Oral argument was held on December 17, 2019.  For the following reasons, we affirm.

¶ 4                                    BACKGROUND

¶ 5                          Defendant's Motion in *Limine*

¶ 6    Prior to trial, defense counsel filed a motion *in limine* to introduce the entire content of the telephone call that defendant had with his sister, Devona Blanch, and his nephew, Lamont Robinson, immediately after the offense into evidence under the completeness doctrine and

_____

[1] Defendant also raised a claim that he was denied a fair trial when the trial court precluded him from introducing the entire telephone conversation with his family members immediately after the offense under the completeness doctrine in his opening brief, but later filed a motion to withdraw the issue on December 20, 2019.  We allowed his motion on January 3, 2020.

Illinois Evidentiary Rule 106 (Rule 106). Ill. R. Evid. 106 (eff. Jan 1, 2011). According to the motion, Devona gave a statement to the police in which she stated that when defendant called her on the night of the offense, "he was crying and said he was sorry and didn't mean it." She stated that defendant was worried that "people in another apartment had heard them arguing," and that defendant and the victim were arguing about the [casino] boats and [the victim] had told him to leave." According to the motion, Devona told the Assistant State's Attorney (ASA) that she then gave the phone to her oldest son, Lamont, and he continued the conversation with defendant for another 10 minutes. The motion also stated that Devona had previously testified in front of the Grand Jury on March 14, 2007, that defendant stated he and the victim were arguing about the victim being addicted to gambling on the riverboats. The motion argued that the content of the conversation defendant had with his sister and nephew should be allowed into evidence to explain, qualify or otherwise shed light on the portion of the statement, "I killed Nikki," that the State sought to enter into evidence, so as to correctly convey the true meaning of defendant's statement to the jury. The motion asserted that the conversation was admissible under the completeness doctrine and Rule 106 to rebut the presumption that the offense was premeditated.

¶ 7    At the hearing on the motion, the trial court denied defendant's motion, finding that the completeness doctrine and Rule 106 (Ill. R. Evid. 106 (eff. Jan 1, 2011)) were inapplicable in this case because they only applied to the introduction of written or recorded statements. The court found that the conversation was hearsay and the exceptions did not apply to the oral statements.

¶ 8                                             Trial

¶ 9     Patricia Thurmond-Jones, the victim's mother, testified that in February 2007, she lived at 11814 South Wentworth in Chicago, which was 75 yards from where the victim lived at 152 West 118th Street in Chicago.  She knew defendant, who was then dating the victim, because his family had lived on the same street and they had been neighbors for 36 years. The victim was 27 years old and had a young son.  She worked as a math teacher at Percy Julian High School, and was also taking night classes as a graduate student at the University of Illinois at Chicago a few times a week.  On February 26, 2007, Patricia was babysitting the victim's son while the victim was in class, and last spoke to the victim at 9:02 p.m., while she was on her way home from class.  She was later awakened at 12:15 a.m. by a banging on her storm door by one of defendant's sisters, who said that she had spoken to defendant and that Patricia needed to go check on the victim because she and defendant had an altercation. Patricia contacted her other daughters and asked them to check on the victim, but no one was able to reach the victim. Patricia had a key to the victim's apartment, but did not give the key to her other daughters. Patricia called the victim's phone several times but could not reach her. The victim usually parked her blue Chevy Malibu by her apartment, but Patricia did not see it parked outside that night. The car was still not there at 5:30 a.m. and the victim did not go to work that day. At approximately 10:00 a.m., Patricia went to defendant's mother's house and spoke to defendant's niece, who told her that she had not seen defendant or the victim. Patricia asked her husband to go to the victim's building and meet with the landlord to check on the victim.  After going to the apartment, Patricia's husband called and told her to call the police. The police went to the victim's apartment and Patricia spoke to them later that day.

¶ 10    Chicago police officer Monique Thompson testified that shortly after noon on February 27, 2007, she responded to a call at 152 West 118th Street.  When she arrived to assist Emergency Medical Services (EMS), the victim's landlord and stepfather were there.  The landlord gave her access to the apartment and she went through the back door. Thompson went into the living room and saw a woman, later identified as the victim, lying on the floor. The victim was unresponsive and appeared to be deceased.  The apartment looked disheveled because things were "thrown around" and the television had been knocked over.  There was no sign of forced entry.  EMS arrived a few minutes later and pronounced the victim dead.  Thompson then notified the detective division.

¶ 11    Detective Steven Lazzara testified that on February 27, 2007, at approximately 1:00 p.m., he and Detective Robert Branigan went to the victim's apartment.  He saw the victim lying face-down on the floor in the living room.  Furniture was knocked over and the apartment was in disarray as if a struggle occurred. The victim was lying on her right side with her left arm over her body and face.  She was fully dressed, and her purse was on the couch. Lazzara saw that the victim's left eye was swollen and bruised. There was blood coming from her mouth and from her nose and she had scrapes and abrasions on her chin and neck area.  After Lazzara spoke to the victim's mother, he went to defendant's residence at 118th and Wentworth and spoke with defendant's mother and sister. The scene was then processed.

¶ 12    Detective Steven Carlassare testified that on February 28, 2007, he was doing a general canvass looking for defendant and a blue Chevy Malibu.  He and Detective Sandoval received information that defendant might be in the area of 7300 South Cicero Avenue, and found the car at the Saratoga Motel at 7701 South Cicero Avenue.  They spoke to the hotel clerk and learned

that the person driving that car was in Room 130. The detectives then notified the Eighth District and asked for more units to respond to the hotel. After the units arrived, they proceeded to Room 130 at approximately 2:50 p.m. Defendant answered when they knocked on the door, gave them his name and the detectives arrested him. Inside the room, detectives recovered the victim's credit and debit cards, driver's license, a gift card, and the keys to the car.

¶ 13    Later that day, Detectives Lazzara and Branigan spoke to defendant in an interview room at the South Branch police station at approximately 3:45 p.m. They had a recorded conversation with defendant about what happened with the victim on February 26, 2007. The room was equipped with electronic recording devices and the equipment was activated once defendant entered the room. Lazzara identified DVDs of their interview with defendant, which were admitted into evidence and published to the jury.

¶ 14    In the video, defendant was first advised of, and waived, his *Miranda* rights. He then gave his name. In his statement, defendant told the detectives that he had been living with the victim for the past four months but would stop by his mother's house to get clothes and things. He was not employed because he was disabled. The victim went to college after teaching during the day and usually got home between 9:00 and 9:30 p.m. The victim called him on February 26th and once she realized defendant had been drinking, she was upset and told him to come get his belongings because she wanted to break up. Defendant had been drinking at a friend's house when she called. Defendant went to the victim's apartment and they began arguing and "one thing led to another." Defendant said that the argument turned into physical wrestling and the victim was trying to push him out of the house. Defendant had a scratch on his forehead above the eye and a scratch on his hand. Defendant then "lost it *** [he] choked her." They were both

on the floor as he was choking her. Defendant said that while he was choking her, she said she could not breathe. He further stated that he "wanted to stop but [he] couldn't - something just came over [him]." In the video, defendant demonstrated how he choked her with his hands around her neck.

¶ 15     After he realized that the victim was dead, he got scared, left the apartment and called his sister and told her that he killed the victim. Defendant also called a friend named Gotti and a woman named Marchelle who lived out of town. He took the car keys and left, but he called his sister again, who told him to go back and see if the victim had just passed out. Defendant then went back to the apartment, felt that the victim's body was cold, and she was not breathing. Defendant then took the victim's keys and wallet and drove to a hotel. He changed hotels once before the police located him because he was scared. When the officers arrived, defendant said that he had just spoken with his mother and was on his way to turn himself in.

¶ 16     Dr. Valerie Arangelovich, a forensic pathologist, testified that she was the Deputy Medical Examiner who conducted the autopsy on the victim in 2007. She testified about the internal and external evidence of injury to the victim's body, which were concentrated in the head and neck area and consisted predominantly of hemorrhages and abrasions. Arangelovich explained that strangulation cuts off the delivery of oxygen to the brain, which leads to unconsciousness and eventually death. She testified that once strangulation begins, it takes about 10 to 20 seconds of 4.4 pounds of constant pressure to cause unconsciousness and somewhere between three to six minutes of 11 pounds of constant pressure to cause irreversible brain death. Arangelovich testified that the multiple abrasions around the victim's neck indicated that she was

struggling during the strangulation, which was the cause of death. She also noted the 20-pound weight difference between the victim and defendant.

¶ 17 Following the witnesses' testimony and the admission of various exhibits, the State rested. Defendant's motion for directed finding was denied.

¶ 18 Devona testified for the defense that they grew up on the same street as the victim and their mother still lived there. Although defendant stayed with their mother off and on around the time of the offense, he also stayed with the victim, who was his girlfriend. Devona did not know the address. She received a call from defendant on February 26, 2007, at approximately 10:00 p.m. The first three words defendant said was that "[he] killed Nikki." Their conversation lasted approximately 10 minutes. Devona was in disbelief; defendant was upset, crying and distraught. Devona gave the phone to her son, Lamont, who spoke to defendant for another 10 minutes. Devona called her sister, Sandra, who lived in Chicago, because she wanted Sandra to go and see if the victim was alright. Sandra did as she asked and Devona called the police. Two police officers came to Devona's house the next day and spoke with her.

¶ 19 Sandra Blanch, defendant's other sister, testified that on February 26, 2007, she received a phone call from their sister Devona. After that conversation, she got in her car and drove to the victim's apartment, which was near their mother's house. Sandra knocked on the victim's door and tried the doorknob, but no one answered. She called the police and two policemen arrived. Sandra explained that someone was seriously injured or perhaps even dead inside, and the officers shined their lights into the windows and checked the doors. Because no one answered, they left. Sandra again called 911 and asked for officers to come to her location, but they did not return a second time. She then went to the victim's mother's house and told the victim's mother

that she needed to go check on her daughter. Sandra had never met the victim.  The next day, the police came to Sandra's house and spoke with her.

¶ 20    Defendant's nephew Lamont testified that he was home on February 26, 2007, when his mother handed him her phone. Defendant was on the phone; his demeanor was terrible, and it was "like there was no more hope in his voice, he was very sad, very emotional."  They spoke for approximately 20 minutes as Lamont tried to console defendant. Lamont then gave the phone back to his mother.

¶ 21    The defense then rested.

¶ 22    During the jury instructions conference, defendant requested an instruction on involuntary manslaughter based on recklessness by defendant placing his hands around the victim's neck.  The State argued that one could not accidentally or recklessly put one's hands around an individual's neck, squeeze them, and strangle them to death.  The trial court denied defendant's proffered involuntary manslaughter instruction.  Defendant also requested a second-degree murder instruction, which the trial court agreed to give to the jury.

¶ 23    The jury subsequently found defendant guilty of first-degree murder following closing arguments.

¶ 24    On January 26, 2017, defendant's amended motion for new trial was denied and the matter proceeded to the sentencing hearing.

¶ 25    At defendant's sentencing hearing, the State entered evidence of a prior 1997 conviction for possession of a stolen motor vehicle for which defendant received 18 months' probation. The State also published victim impact statements from the victim's mother, stepmother, and two sisters. The State asked that defendant be sentenced to 50 years' imprisonment.

¶ 26    In mitigation, defendant presented the live testimony of Devona and argued that he suffered from mental health issues and substance abuse, but since his incarceration for this offense, he received treatment for both and was considered a model prisoner.  Defendant argued that he showed the potential for great rehabilitation, a goal of sentencing, and that he should receive a sentence reflective of that rehabilitation. In allocution, defendant stated that he thought of the victim every day, missed her and wished that she was still here, and that he never meant for her to die. Defendant regretted his actions and prayed for forgiveness, which he knew would never come.

¶ 27    The trial court stated that it considered the evidence presented at trial, the information in defendant's Presentence Investigation Report (PSI), the evidence offered in aggravation and mitigation, the live testimony and the victim impact statements, defendant's statement in allocution, the attorneys' arguments and each statutory factor in aggravation and mitigation.  The court reviewed the facts of the case and stated:

> "Putting your hands around another human being's neck in this case is another type of first[-]degree murder.  It's particularly horrible or tragic, if that's the way you want to use the term, when your hands are around the neck of someone you know and purportedly love.  It's personal. It's brutal. It's a slow, calculated act designed to squeeze the life out of someone out of pure anger or other motives.
>
> The person who does this controls everything with his or her hands.  The length of time, the amount of pressure applied and the force.  Unlike a quick discharge of a gun in a stressful situation based on anger or resentment, this person is using

his or her own hands to kill… The hands on the neck can be removed. A life can be saved. All one has to do is ease the pressure and to come to one's senses to avert the death of another human being.

The type of behavior [defendant] engaged in was cold and calculated, inhumane and brutal. It occurred in the victim's own home and its method and result was disastrous. It is the cause and manner of death inflicted by strangulation of the victim in this case, Tanisha Thurmond (sic.), in her own- which merits the considered sentence the Court is about to give. Such sentence is needed to deter others from these brutal and barbaric acts.

The Court reviewed the injuries that were inflicted upon the victim in this case by [defendant]. The external injuries, eyes, petechial hemorrhage; nose abrasions; lips, multiple lacerations; chin, multiple abrasions; ears abrasions; neck, multiple linear abrasions, the right check had multiple bruises in it. The internal injuries, the tongue hemorrhages, epiglottis hemorrhages, neck muscles hemorrhages, the check multiple hemorrhages, the skull and brain were swollen with subarachnoid hemorrhages. Cause of death was strangulation by oxygen deprivation. Ten to 20 seconds of pressure to render this victim unconscious. And it was all the complete control and volition of [defendant]."

¶ 28    The trial court then sentenced defendant to 50 years' imprisonment. Defendant's motion to reconsider sentence was denied, the trial court restating that it carefully considered each "administrative" factor in aggravation and mitigation and that defendant's sentence was based on

all factors in aggravation and mitigation, the arguments of counsel and the facts heard at the trial. This appeal followed.

¶ 29                                    ANALYSIS

¶ 30    Defendant has raised three issues on appeal: (1) whether he was proven guilty of first-degree murder beyond a reasonable doubt when the State's evidence only proved involuntary manslaughter; alternately, whether the evidence proved second-degree murder; (2) whether he was denied a fair trial when the trial court refused to instruct the jury on involuntary manslaughter and precluded him from introducing the entire conversation with his family members shortly after the offense under the completeness doctrine; and (3) whether his 50-year sentence is excessive.

¶ 31                        A. Sufficiency of the Evidence

¶ 32    Defendant first contends that he was not proven guilty of first-degree murder beyond a reasonable doubt. He asserts that the only evidence at trial to explain the circumstances leading to the victim's death was his statement, in which he described how the offense occurred. He claims that the evidence only shows that he acted recklessly in choking the victim and unintentionally killed her, thus consciously disregarding a substantial, unjustifiable risk that death or great bodily harm would result. Alternately, defendant contends that his conviction should be reduced to second-degree murder where the evidence proved that he was acting under a sudden and intense passion, resulting from serious provocation and mutual combat.

¶ 33    When reviewing a challenge to the sufficiency of the evidence, the reviewing court's function is not to retry the defendant. *People v. Nere*, 2018 IL 122566, ¶ 69. Rather, the court considers whether, "viewing the evidence in the light most favorable to the State, '"*any* rational

trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (Emphasis in original.)" *Nere*, 2018 IL 122566, ¶ 69 (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985), quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

¶ 34    "The basic difference between involuntary manslaughter and first-degree murder is the mental state that accompanies the conduct resulting in the victim's death." *People v. DiVincenzo*, 183 Ill. 2d 239, 249 (1998), *abrogated on other grounds by People v. McDonald*, 2016 IL 118882. "The mental state for murder is knowledge, while the mental state for involuntary manslaughter is recklessness." *People v. Jones*, 404 Ill. App. 3d 734, 742 (2010).

¶ 35    A person knows or acts knowingly or with knowledge of: "(b) [t]he result of his conduct, described by the statute defining the offense, when he is consciously aware that such result is practically certain to be caused by his conduct." 720 ILCS 5/4-5(b) (West 2006). "A person acts recklessly when he 'consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow *** and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation.'" *Jones*, 404 Ill. App. 3d at 742 (quoting 720 ILCS 5/4-6 (West 2006)). In general, a person acts recklessly when he is aware that his conduct might result in death or great bodily harm, although that result is not substantially certain to occur. *DiVincenzo*, 183 Ill. 2d at 250. Typically, recklessness involves a lesser degree of risk than conduct that creates a strong probability of death or great bodily harm. *DiVincenzo*, 183 Ill. 2d at 250. "[R]ecklessness and knowledge are mutually inconsistent culpable mental states." *People v. Fornear*, 176 Ill. 2d 523, 531 (1997).

¶ 36    In this case, it is undisputed that defendant's act of choking the victim resulted in her death. Only his mental state at the time of the offense is at issue. Since direct evidence of a

defendant's mental state is usually lacking, it may be inferred from the surrounding circumstances, including the character of the defendant's acts and the nature of the victim's injuries. *Jones*, 404 Ill. App. 3d at 744. The question of whether a defendant acted intentionally, knowingly or merely recklessly is generally a question for the trier of fact. *Jones*, 404 Ill. App. 3d at 744.

¶ 37     The circumstances presented in this case are nearly identical to those presented in *People v. Leach*, 405 Ill. App. 3d 297 (2010), *aff'd*, 2012 IL 111534 (2012).  In that case, the defendant killed his wife by strangulation and on appeal, challenged the sufficiency of the evidence for first-degree murder, contending instead, like the defendant in the case at bar, that the evidence reflected involuntary manslaughter.

¶ 38     This court disagreed, noting that the defense "candidly" acknowledged that defendant performed the acts which caused the death of his wife.  *Leach*, 405 Ill. App. 3d at 312. The court further noted that, in the course of defendant's court-reported confession, he admitted that although he fatally choked his wife, he did not mean to kill her; her death was an accident.  *Id*. In rejecting the defendant's claim of "accident," the trial court in *Leach* reasoned that while accidents happened with guns, knives, or automobiles, it was incomprehensible that the act of strangling a person with one's own hands could fall within the rubric of an accident.  *Id*. The trial court rejected the defendant's argument that his acts were simply performed recklessly, which was supported by the testimony of the medical examiner and defendant himself. *Id*. at 312-13.

¶ 39     We concluded that the trial court could have reasonably found that the defendant was consciously aware that his conduct was practically certain to result in death or great bodily harm. *Id*. at 313. Noting that there may have been some significance to the defendant's claim that when

he "came to his senses" and realized that his wife was not moving, he immediately ascertained that she had no pulse and attempted to revive her. *Id.* Further, we noted that although defendant's attempt to revive his wife was "laudable," it also "manifested an awareness that the natural tendency of strangling another human being for three to six minutes is to destroy that person's life." *Id.* We concluded that it was undisputed that defendant knowingly placed his hands on his wife's neck and exerted sufficient force to first render her unconscious and eventually dead. *Id.* The requisite mental state could clearly be inferred from the very nature of defendant's voluntary acts and after viewing the evidence in the light most favorable to the State, this court found that the evidence was sufficient to support the essential elements of first degree murder beyond a reasonable doubt. *Id.*

¶ 40    The same circumstances are presented here. After an argument during which defendant claimed that he and the victim wrestled and she scratched him, he began to choke her. He choked her while she struggled against him and continued to choke her even after she told him that she could not breathe. Defendant claims that he "lost it" and just could not stop, but he has also maintained and acknowledged that his act of choking the victim led to her death. Like the defendant in the *Leach* case, defendant does not dispute that he voluntarily and knowingly choked the victim and exerted enough pressure to first hinder her breathing, then render her unconscious, and then, eventually, dead. Defendant cannot claim that his voluntary and knowing acts were reckless in order to meet the requirements for involuntary manslaughter. We find that the evidence was sufficient to sustain defendant's conviction for first-degree murder.

¶ 41    Alternately, defendant contends that the evidence proved second-degree murder. This argument is also without merit. Again, this argument is identical to the one made in *Leach*. There

we noted that second-degree murder is a lesser-mitigated offense of first-degree murder, meaning that the penalties are less than first-degree murder, and it is first-degree murder plus proof that a mitigation factor was present. *Leach*, 405 Ill. App. 3d at 313.

¶ 42   We further noted that second-degree murder requires additional proof of a mitigating element, either passion-provocation or imperfect self-defense. *Id*. at 314.   We found that the defendant's argument was incongruent – in asserting his involuntary manslaughter claim, defendant denied that his acts were accompanied by the requisite intentional or knowing mental state required for first-degree murder; and then in the alternate argument, by necessity the defendant essentially conceded that the State proved intentional or knowing murder beyond a reasonable doubt in order to raise the presence of mitigating factors. *Id*. at 314.

¶ 43   Turning to the merits of the defendant's alternate argument, we concluded that the defendant's passion, no matter how violent, "will not relieve the individual of culpability for first degree murder unless it is engendered by provocation that the law recognizes as reasonable and adequate." *Id*. at 315. See also *People v. Garcia*, 165 Ill. 2d 409, 429 (1995); *People v. Austin*, 133 Ill. 2d 118, 125 (1989). Moreover, to mitigate first-degree murder, the law requires "serious" provocation, or "conduct sufficient to excite intense passion in a reasonable person."   720 ILCS 5/9-2(b) (West 2002).   The only categories of serious provocation that are recognized in Illinois are substantial physical injury or assault, mutual quarrel or combat, illegal arrest, and adultery with the offender's spouse.  *Leach*, 405 Ill. App. 3d at 315. We found that the evidence showed that the defendant was not engaged in mutual combat with his wife; rather he was simply trying to attempt to contain her by grabbing her hands before choking her.  Although her acts may have been provocative, there was no evidence that the victim and the defendant entered the altercation

willingly, nor was the fight mutually on equal terms. *Id*. at 315. Noting that the defense "boldly" stated that the only evidence to explain the circumstances leading to his wife's death was the defendant's statement and there was no evidence to disprove it, we rejected the defendant's claim, finding that the defendant did not suffer any significant wounds or bruises and that the trier of fact was free to reject the defendant's exculpatory statements. *Id*. at 317.

¶ 44    The same result is warranted here.  Defendant's arguments that the evidence proved only involuntary manslaughter and his alternate argument that the evidence proved second-degree murder are incongruent for the same reasons noted by this court in *Leach*.  Moreover, defendant has provided no evidence of substantial physical injury or assault; defendant merely pointed to a scratch on his forehead sustained during the physical altercation with the victim. While there was evidence of a physical struggle as observed by the police and the state of the victim's living room which resulted in the both of them on the floor, there was no evidence that there was a serious provocation that would sufficiently excite intense passion in a reasonable person.  In short, there was no mitigating evidence to support defendant's theory that his intentional act of choking the victim to death was anything other than first-degree murder.  We therefore reject defendant's argument that the evidence proved second-degree murder.

¶ 45                B.  Jury Instructions on Lesser-Included Offense

¶ 46    Defendant next contends that he was denied a fair trial when the trial court refused to instruct the jury on the lesser included offense of involuntary manslaughter. He maintains that his statement established that he choked the victim during a struggle where they were engaged in mutual combat and therefore was sufficient evidence to support the instruction. Defendant renews his argument that his conduct was merely reckless.

¶ 47    The giving of jury instructions is a matter within the sound discretion of the trial court. *People v. Jackson*, 372 Ill. App. 3d 605, 613 (2007).  The standard for determining whether a defendant is entitled to a jury instruction on a lesser-included offense is whether there is some evidence in the record that, if believed by the jury, will reduce the crime charged to a lesser offense.  *People v. McDonald*, 2016 IL 118882, ¶ 25.

¶ 48    As noted above, the basic difference between involuntary manslaughter and first-degree murder is the mental state that accompanies the conduct resulting in the victim's death.  *Jackson*, 372 Ill. App. 3d at 613, (citing *People v. Daniels*, 301 Ill. App. 3d 87, 95 (1998)). A defendant may act recklessly when he commits deliberate acts but disregards the risks of his conduct.  See 720 ILCS 5/4-6 (West 2006).  However, Illinois courts have consistently held that when the defendant intentionally does an act aimed at the victim, such as intending to fire a gun, pointing it in the general direction of the intended victim and shoots, such conduct is not merely reckless and does not warrant an involuntary manslaughter instruction, regardless of the defendant's assertion that he or she did not intend to kill anyone.  See *People v. Eason*, 326 Ill. App. 3d 197, 210 (2001).  A defendant's testimony that he did not intend to kill anyone does not provide a sufficient basis for instructing on involuntary manslaughter.  *People v. Cannon*, 49 Ill. 2d 162, 166 (1971).  A defendant is not entitled to reduce first-degree murder to a Class 1 felony by a hidden mental state only known to him and unsupported by the facts.  *Jackson*, 372 Ill. App. 3d at 614.

¶ 49    Here, as discussed above, the evidence established that defendant's conduct supported his conviction for first-degree murder and that the offense of involuntary manslaughter was not supported by the evidence.  In this case, defendant admitted that he choked the victim and kept

choking her until she died, even after she told him that she could not breathe. Defendant's statements that he did not intend to kill her and that he wanted to stop but "lost it" and just could not stop were insufficient to support a conviction for involuntary manslaughter and were likewise insufficient to support a jury instruction for involuntary manslaughter. As the trial court noted, defendant's conduct was intentional and not reckless. We conclude that the trial court did not abuse its discretion in refusing to give a jury instruction on involuntary manslaughter.

¶ 50                    C.  Excessive Sentence

¶ 51    Finally, defendant contends that his 50-year sentence is excessive because of his minimal criminal history, his history of alcohol and drug abuse, the fact that he expressed remorse and that he has demonstrated rehabilitation while incarcerated.

¶ 52    We review a trial court's sentencing decision for an abuse of discretion, as the trial court, having observed the defendant and the proceedings, is better suited to consider sentencing factors than the reviewing court, which relies on the "cold" record. *People v. Decatur*, 2015 IL App (1st) 130231, ¶ 12. A sentence within statutory limits will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. *People v. Romero*, 387 Ill. App. 3d 954, 978 (2008). It is the seriousness of the crime- rather than the presence of mitigating factors – that is the most important factor in determining an appropriate sentence. *Decatur*, 2015 IL App (1st) 130231, ¶ 12. Indeed, the reviewing court will not find that a minimum sentence is necessarily warranted merely due to the presence of mitigating factors, nor will it substitute its judgment for that of the trial court because it may have balanced the factors differently. *Id*.

¶ 53    The sentencing range for first-degree murder is 20 to 60 years' imprisonment.  730 ILCS 5/5-4.5-20(a) (West 2016).  Defendant does not dispute that his sentence falls within the statutory range.  Instead he contends that his near-maximum sentence was excessive due to the mitigating factors that were presented, and the fact that the trial court imposed a sentence that was "more than twice the minimum required by law, it [was] clear that the trial court did not adequately consider [defendant's] mitigation or rehabilitative potential."  Defendant's argument is misplaced.

¶ 54    Here, the record shows that the trial court expressly stated that it was considering the evidence presented at trial, the evidence presented in both aggravation and mitigation, defendant's statement in allocution, the victim impact statements and defendant's PSI report in setting defendant's sentence, as well as the statutory factors in aggravation and mitigation.  The trial court also gave a lengthy statement as to why it was sentencing defendant, particularly noting that first-degree murder by strangulation was a personal crime, one in which the defendant had a choice and control over the situation. Defendant points to nothing other than the length of the sentence in support of his contention. We find that the trial court did not abuse its discretion in sentencing defendant to a 50-year term of imprisonment for the strangulation murder of the victim.

¶ 55                                    CONCLUSION

¶ 56    For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 57    Affirmed.