# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Castillo*, 2012 IL App (1st) 110668

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM CASTILLO, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-11-0668 |
| Filed | June 22, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a prosecution for first degree murder, the denial of defendant's request for an instruction on involuntary manslaughter was not an abuse of discretion where there was no evidence defendant acted recklessly and the defendant knew his acts created a strong probability of death or great bodily harm based on the facts that the victim had been punched and knocked to the ground and was motionless when defendant kicked him in the head; furthermore, defendant failed to show the prosecution's use of his nickname, "Kill Bill," even if excessive, was a "structural error." |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-15667; the Hon. James B. Linn, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal     Jon F. Erickson and Michael D. Oppenheimer, both of Erickson & Oppenheimer, Ltd., of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Janet C. Mahoney, Assistant State's Attorneys, of counsel), for the People.

Panel     PRESIDING JUSTICE EPSTEIN delivered the judgment of the court, with opinion.

Justices J. Gordon and Howse concurred in the judgment and opinion.

**OPINION**

¶ 1     Following a jury trial, defendant William Castillo, was convicted of murder. He was sentenced to 30 years in prison. On appeal, defendant argues that he was denied his right to a fair trial because: (1) the trial court denied his request for a jury instruction on involuntary manslaughter; and (2) the State made excessive and improper use of his alleged nickname of "Kill Bill." For the reasons below, we affirm.

¶ 2                  BACKGROUND

¶ 3     Defendant William Castillo and codefendant Semajay Thomas were charged by indictment with first degree murder in connection with the July 13, 2009, beating death of Reynaldo Ortiz that occurred on the 700 block of North Throop Street in Chicago, Illinois. Defendant and Thomas were tried simultaneously with separate juries.

¶ 4                   State's Case in Chief

¶ 5                   *Reynaldo Ortiz, Jr.*

¶ 6     Reynaldo Ortiz, Jr., testified that his father, Reynaldo Ortiz, Sr., was in the Chicago area in July 2009 for a family reunion. He also testified that July 13, 2009 was his father's fiftieth birthday.

¶ 7                   *Reinaldo Gonzales*

¶ 8     Reinaldo Gonzales testified that, on July 12, 2009, he was with his cousin, Reynaldo Ortiz, Sr., playing softball in the park. They started drinking beer and vodka in the afternoon. Shortly after midnight, the two men, along with a friend, Gustavo, left the park to go to Gustavo's house. Gustavo rode ahead on his bike, while Gonzalez and Ortiz walked. As they walked on the 700 block of Throop Street, Ortiz said "What's up bitches?" to a group sitting

on a porch. Four or five of the people left the porch and ran after Ortiz, who ran between two cars. Gonzalez "froze" by a fence, two houses away from where the group then beat Ortiz. Gonzalez testified that he could not see what the group did to Ortiz. He called out to Ortiz and got no response. Gonzalez then ran to his sister's house and, as he did, one of the men, later identified as Jesus Duran, ran past him. When Gonzalez reached his sister's house, he called 911.

¶ 9                                        *Dr. Michael Humilier*

¶ 10        Dr. Michael Humilier, an expert forensic pathologist, testified that he performed the post-mortem examination on Ortiz. Ortiz's blood alcohol level was 0.271. The external examination revealed 13 injuries: (1) a laceration and bruise to the right top of the head that exposed the underlying skull because the tissue was torn all the way down to the skull; (2) a bruise on the right eyelid; (3) a laceration with a surrounding abrasion to the bridge of the nose; (4) an abrasion or scrape to the midline of the forehead; (5) an abrasion to the left side of the face near the left eye; (6) a bruise on the left cheek; (7) a bruise on the right cheek; (8) an abrasion on the nose; (9) an abrasion on the left side of the upper lip; (10) an abrasion on the right side of the chin; (11) an abrasion on the left side of the chin; (12) an abrasion to the front right knee; and (13) a healing wound on the front left knee.

¶ 11        Dr. Humilier testified that the internal examination revealed six injuries: (1) a subgaleal hemorrhage (blood that had leaked into the soft tissues below the skin) on the right side of the scalp; (2) a subgaleal hemorrhage that measured three inches by five inches to the top of the scalp; (3) a subgaleal hemorrhage that measured 2½ inches by 2 inches to the left side of the scalp; (4) a subgaleal hemorrhage that measured 1½ inches by 1½ inches to the back of the scalp; (5) a fractured skull, specifically a fracture in the bone on the right side of the frontal bone of the skull; and (6) significant swelling of the brain. Ortiz also had cirrhosis of the liver.

¶ 12        Dr. Humilier testified that the external injuries were consistent with blunt force trauma, and with being punched or kicked in the face. He stated that the subgaleal hemorrhages, as well as the fractured bone, were consistent with blunt force traumas. Dr. Humilier explained that the frontal bone, which is underneath the forehead, is a strong bone. When the frontal bone is fractured it causes brain injuries and cerebral edema (brain swelling). Dr. Humilier concluded that all of the internal injuries, including the brain swelling, were consistent with Ortiz having been stomped on or kicked and were not likely caused by him falling to the ground. Dr. Humilier explained that Ortiz would have had to fall more than once in order to sustain the numerous injuries that he had to his head. He further explained that a fall should not cause a skull fracture in an adult.

¶ 13        Dr. Humilier testified that it was his opinion, within a reasonable degree of scientific certainty, that Ortiz died from cranial cerebral injuries due to blunt force head trauma due to an assault. He concluded that the manner of death was homicide.

¶ 14                                        *David Calzado*

¶ 15        David Calzado testified that he was a Satan Disciple. He testified that, in the early hours

of July 13, 2009, he was hanging out on Sara's porch on Throop Street with several people, including Semajay Thomas, Terrence Washington (a Satan Disciple known as "Wes"), Lorenzo McKinney (known as "Low"), and Low's younger brother, Maliek. Calzado had known them his whole life. Also present were some new gang members, "Kill Bill," "Silent," and "Drama," whom Calzado had known only for a week. Kill Bill was a Satan Disciple and Calzado did not know his real name. He identified defendant in court as Kill Bill. Silent was a Satan Disciple and Calzado did not know his real name either. Little Man, who was known as Lydell, was also present.

¶ 16    Calzado testified that, in the week he had known defendant, he had seen him two or three times riding around the neighborhood.

¶ 17    Calzado testified that, while on the porch, he saw "two old guys" who were "probably in their 50's, 60's," walk past the porch on the other side of the street. An argument ensued between the two men and the men on the porch. Calzado testified that the one of the two men walking by was swearing and said "You stupid bitch, fuck you," "I'm going to fuck you up," and "I'm going to beat your ass." Thomas left the porch, followed by defendant and Silent. Thomas hit the man who was swearing on the right side of the face and then a second time. He kept hitting the man, up to six times. Each punch hit the man's face. After the final punch, the man stumbled toward the street and fell.

¶ 18    Defendant then approached the man and stomped on his forehead once. Calzado could hear it. The man stopped moving after defendant stomped on him. Calzado testified that defendant walked up to the porch and they were all "like panicking, what the hell." Defendant then went to his small red car and drove away with almost all of the other men who were on the porch, including Calzado. Thomas did not go with them.

¶ 19    Calzado testified that defendant drove to a gas station and got out of the car. Defendant had blood on his leg and shoelaces. Calzado testified that defendant said "I got evidence on my pants, I need to get rid of it." Defendant went into the bathroom and when he came out Calzado did not see blood on his leg. He saw blood on defendant's shoelaces but defendant threw the shoelaces away in the garbage can in front of the gas station. Everyone got back in the car and defendant dropped Calzado off at his home.


¶ 20                                    *Lorenzo McKinney*

¶ 21    Lorenzo McKinney, known as "Low," testified that he was not a Satan Disciple but was affiliated with them. He was on the porch on Throop Street on July 12, 2009, with his brother, Maliek Green, Terrence Washington, Thomas, and Calzado, also known as "Tarzan" or "Day Dog." McKinney testified that Calzado and Washington were friends he grew up with. McKinney admitted that Calzado, Washington, and Thomas were members of the Satan Disciples. Also present were three Satan Disciples that McKinney had met that week, Silent, Drama and Kill Bill. McKinney identified defendant in court as Kill Bill.

¶ 22    While on the porch, McKinney saw two men in their fifties or sixties walking on the opposite side of the street with beers in their hands. The two men were screaming out "bitch" words. Thomas, defendant, and Silent left the porch and approached the men. McKinney stated that Thomas pushed one of the men and the man stumbled into the middle of the street

next to Silent. Silent hit the man twice in the temple with a closed fist and the man fell to the ground. Defendant then kicked the man twice in the top part of the head.

¶ 23 According to McKinney, Thomas did not hit the man. He also testified that Thomas was his friend, as well as his brother's friend, and still was at the time of trial.

¶ 24 McKinney testified that he spoke to Assistant State's Attorney (ASA) Suzi Collins and Detective Cortez on August 7, 2009, and gave a handwritten statement which he reviewed and signed. McKinney told ASA Collins that he saw Thomas punch the man, who was yelling at the group, in the face. He also stated that Silent punched the man and that defendant stomped on the man's head.

¶ 25 McKinney testified that, on August 7, 2009, after he made his handwritten statement, he spoke to Detective Sandoval at the police station. He told Detective Sandoval that Thomas approached the man and punched him in the face several times, that Silent hit the man in the head, and that defendant stomped on the man's head with his foot.

¶ 26 McKinney stated that, on August 25, 2009, he testified under oath before the grand jury. He stated that he was a Satan Disciple and that defendant and Silent were Satan Disciples. He also testified that he saw Thomas, defendant, and Silent run toward the men, and that Thomas punched the one man in the face twice with a closed fist. He further testified that defendant stomped and kicked the man.

¶ 27 McKinney testified that he made another statement on October 28, 2009, while he was at home on Throop Street. He told the investigator that he was "never out there" on the night of July 13, 2009.


¶ 28 *Maliek Green*

¶ 29 Maliek Green testified that he was McKinney's brother. He was Thomas's friend and had known him his whole life. Thomas was a boxer and Green had spent the day of July 12, 2009 with him as he boxed and trained. The two returned to Thomas's house on the 700 block of Throop Street around midnight. They joined Green's brother, Calzado, and Drama. Green testified that Kill Bill, whom he identified in court as defendant, was not present.

¶ 30 As they stood on the porch, two men passed and one of the men called someone a "bitch." He testified that one of the men was killed but he was not really paying attention and was on the phone. He stated that when he looked up, Thomas was right by him, and one of the men was dead.

¶ 31 Green acknowledged that he, with his mother present, had met with an assistant state's attorney on August 7, 2009 and she asked him what happened. His statement was reduced to writing. Green, his mother, and the ASA signed the statement. Green told the ASA that after the man yelled at the group of people who had gathered on the porch, Thomas and defendant ran across the street. Thomas punched the man in the face and the man fell to the ground. Green then saw defendant kick the man in the head after he fell.

¶ 32 Green returned to the police station on August 9, 2009. He viewed a lineup and identified defendant. Green also admitted that he testified under oath before the grand jury on August 21, 2009 that he was on the 700 block of Throop Street on July 13, 2009, when some older

men walked by across the street. One of the men, who was carrying a bag, called Wes a "bitch." Thomas and defendant ran across the street toward the man. Thomas punched the man who was carrying the bag in the face about three to four times. The man fell by the car and then defendant kicked the man in the head about three times. The man stopped moving. Defendant ran to his car, where he was joined by others, and drove away. Thomas ran home.

¶ 33                                              *Devindra Diaby*

¶ 34        Devindra Diaby testified that he was known as "Drama" and he was best friends with defendant, whom he had known his whole life. He only knew defendant as Will. He denied being present at Throop Street on July 13, 2009.

¶ 35        Diaby admitted he spoke to an ASA on August 8, 2009 at the police station and that he testified under oath before the grand jury on August 18, 2009. At the grand jury proceeding, Diaby testified that defendant was his best friend. Diaby called defendant Will, but other people called him Kill Bill. Diaby also knew Thomas and defendant's cousin, Jesus Duran, who was called "Silent." Defendant, Silent, and Thomas were members of a street gang, the Satan Disciples. On July 13, 2009, defendant and Silent picked up Diaby and they drove to the 700 block of North Throop around midnight. There were about 25 people there. While on the porch, Diaby noticed "some guy walking down the street drunk" and "stumbling." He made some comments to the people on the porch and said the word "punk." Thomas, defendant, and Silent crossed the street and approached the man. Thomas got into an argument with the man and punched the man three times in the face and knocked him out. The man fell to the ground and then defendant kicked the man one time. The man did not move or get up after defendant kicked him. After someone said they were calling the police, everyone left and defendant drove Diaby home. Silent was also in the car. On the way, defendant told Diaby that Thomas knocked the man out. Diaby testified that defendant asked them "Did you see how hard [Thomas] hit the man?" and Diaby responded "Yeah, kind of." After he got home, Diaby went to sleep.

¶ 36        Diaby also testified before the grand jury that he spoke to defendant about the fight in the afternoon on July 13, 2009 when defendant came to Diaby's house. Defendant told Diaby that "some guy was talking shit" and defendant went over there with Thomas and Silent "and whooped his ass." Defendant told Diaby he kicked the man. Defendant also said that Thomas knocked the guy out with a "three-hit combo," which meant three punches to the face. After this conversation, Diaby heard defendant talk about the fight on three additional occasions. Diaby believed that defendant was bragging about it.

¶ 37        Diaby testified at trial that the testimony he gave to the grand jury was not the truth. He stated that he was not present on the night of the beating and he lied to the officer and gave false testimony to the grand jury because he feared he was going to be charged with murder.

¶ 38        Chicago Detective Sandoval, ASA Araceli Delacruz, Detective Michael Moreth, and ASA Suzi Collins also testified for the State.

¶ 39                                    Defendant's Case
¶ 40                                   *William Castillo*
¶ 41    Defendant testified on his own behalf. He stated that he was on the porch on Throop Street on July12, 2009 with his cousin Jesus Duran, a Satan Disciple from the Springfield and Ainslie area whose street name was "Silent." Defendant testified that Satan Disciples from the Elizabeth and Huron area were also there and that they called him "Kill Bill." Defendant stated that he was not a Satan Disciple at that time, but that he was at the time of trial.

¶ 42    Defendant testified he was sitting on a stoop talking to everyone when he heard two people "obnoxiously talking." He testified that the men were drinking and one was cursing at them. One of the men on the porch responded by asking the man if he was "straight." Defendant stated at trial that the question means "are you looking for anything, drugs." Defendant testified that the man responded by calling them "bitches" and asking them "what the fuck does that mean" and "stuff like that." Thomas jumped off the stoop and ran across the street to the man. Defendant stated that the man "put his guards up in a boxing fashion" and that Thomas, who defendant testified was a professional boxer, did so as well. The man swung and Thomas ducked. Defendant testified that the man proceeded to fight and Thomas "[l]ike dodge the punch and he came back and punch." According to defendant, Thomas punched the man in the "gut, midsection," with his right hand. Thomas next "followed up with the left to the right side of the body." Defendant testified that both of the punches went to the middle of the man's torso. Defendant stated that the man then "balled up a little bit in pain" and started running away from Thomas.

¶ 43    Defendant stated that, as the fight proceeded and the man ran, defendant and everyone else got off the porch to go see Thomas fight because he is a boxer. As the man was running down the street and between cars with Thomas chasing him, defendant testified that he just stood in the street watching.

¶ 44    Defendant testified that Thomas eventually cut the man off. Thomas then punched the man in the left cheek with his right hand. When the man stumbled a little bit, Thomas hit him again with his left hand. At that point, the man "kind of balled up." Defendant stated that, while the man was down, balled up, and trying to protect his face, Thomas continued to beat up the man. Thomas hit him in the head and the man did not hit back. Defendant stated that the man fell straight to the ground, making no effort to stop himself from falling forward. The man was knocked out after Thomas hit him in the head. Defendant saw the man's "face smash into the cement" and the man did not move after that.

¶ 45    Defendant stated that, at this point, he was still standing in the street with the others and had not gotten too close to the fight. After the man hit the ground everyone ran. Defendant stated that he went to his car with his cousin and "Low" and drove to a fast food restaurant and ordered food. Other Satan Disciples from the Elizabeth and Huron area, including Lydell Brown, known as "Little Man," met them there. Defendant then drove to a gas station where they met more Satan Disciples, including David (Day Dog) Calzado's brother, Mikey, and David Maraja or Navarro, known as "Indio." Defendant testified that Mikey was a Satan Disciple from the Elizabeth and Huron gang and Indio was a Satan Disciple from the Ohio

and Springfield area. Defendant left the gas station and drove Mikey, Indio and his cousin, Silent, to their homes. Defendant then drove himself home.

¶ 46 Defendant testified that Devindra Diaby, also known as "Drama" and a Satan Disciple from Springfield and Ainslie, told defendant that the police were looking for him. Drama gave defendant the telephone number for the detective who was looking for him, Detective David Cortez. Defendant called Detective Cortez and turned himself in at the police station. Defendant learned that the victim had died on the day he turned himself in at the police station.

¶ 47                                                      ANALYSIS
¶ 48                               Involuntary Manslaughter Instruction

¶ 49 Defendant first argues that he was entitled to a jury instruction on the offense of involuntary manslaughter. "The basic difference between involuntary manslaughter and first degree murder is the mental state that accompanies the conduct resulting in the victim's death." *People v. DiVincenzo*, 183 Ill. 2d 239, 249 (1998). Involuntary manslaughter requires a less culpable mental state than first degree murder. *People v. Jones*, 219 Ill. 2d 1, 31 (2006). A person commits first degree murder when he kills an individual without lawful justification and he knows that his acts create a strong probability of death or great bodily harm. 720 ILCS 5/9-1(a)(2) (West 2008). A person commits the offense of involuntary manslaughter if he performs acts that are "likely to cause death or great bodily harm to some individual, and he performs them recklessly." 720 ILCS 5/9-3(a) (West 2008). Recklessness is statutorily defined:

> "A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2008).

Defendant asserts that there was significant evidence at trial to support the inference that he acted recklessly in that his deliberate actions were performed "without regard for the risk that they might cause such a grave result for Mr. Ortiz" and that he "did not know nor could he have known that such a brief, weaponless fight was practically certain to have such somber consequences."

¶ 50 Whether to issue a jury instruction is within the province of the trial court. *People v. Garcia*, 165 Ill. 2d 409 (1995). A trial court's decision not to issue an instruction will not be reversed unless it is an abuse of discretion. *Id.* "A trial court abuses its discretion when its decision is 'fanciful, arbitrary, or unreasonable to the degree that no reasonable person would agree with it.' [Citation.]" *People v. Kladis*, 2011 IL 110920, ¶ 23.

¶ 51 "An instruction is justified on a lesser offense where there is some evidence to support the giving of the instruction." *People v. Castillo*, 188 Ill. 2d 536, 540 (1999). We note that in some, but not all, Illinois Supreme Court opinions, the court has stated that there must be some "credible" evidence in the record in order to justify giving the instruction. See *People v. Jones*, 219 Ill. 2d 1, 31 (2006); *DiVincenzo*, 183 Ill. 2d at 249; *People v. Ward*, 101 Ill. 2d

443, 451 (1984). We do not interpret the statement to mean that this court, in determining whether the instruction should have been given, must determine whether the evidence in the record was credible. Rather, as our supreme court has also explained, many of its decisions have stated that an instruction defining a lesser offense should be given "if there is any evidence in the record which, *if believed by the jury*, would reduce a charge of murder to manslaughter." (Emphasis added.) (Internal quotation marks omitted.) *People v. Carter*, 208 Ill. 2d 309, 323 (2003) (quoting *People v. Taylor*, 36 Ill. 2d 483, 488 (1967)); see also *People v. Foster*, 119 Ill. 2d 69, 87 (1987) ("[w]hen there is evidence in the record which, if believed by the jury, would reduce the crime of murder to manslaughter, an instruction defining the lesser crime should be given"). Thus, a trial court's failure to give an instruction constitutes an abuse of discretion if there is "some evidence" that supports the instruction. *Id.*

¶ 52 A defendant's state of mind can rarely be proved by direct evidence but it can be shown by surrounding circumstances, including the character of the defendant's acts and the nature and seriousness of the victim's injuries. *People v. Williams*, 165 Ill. 2d 51, 64 (1995). Although defendant testified, he denied kicking the victim, and, instead, testified that he just watched as Thomas hit and punched the victim. Thus, defendant did not testify as to his mental state and there is no direct evidence on the issue. On appeal, defendant asserts that the surrounding circumstances constituted evidence supporting an inference that defendant acted "recklessly," which warranted a jury instruction on involuntary manslaughter.

¶ 53 As the Illinois Supreme Court has explained:

"Although not dispositive, certain factors may suggest whether a defendant acted recklessly and whether an involuntary manslaughter instruction is appropriate. These include: (1) the disparity in size and strength between the defendant and the victim [citations]; (2) the brutality and duration of the beating, and the severity of the victim's injuries [citations]; and (3) whether a defendant used his bare fists or a weapon, such as a gun or a knife [citations]. In addition, an involuntary manslaughter instruction is generally not warranted where the nature of the killing, shown by either multiple wounds or the victim's defenselessness, shows that defendant did not act recklessly. [Citation.] Whether an involuntary manslaughter instruction is warranted depends on the facts and circumstances of each case." *DiVincenzo*, 183 Ill. 2d at 251.

¶ 54 Defendant asserts that the evidence in the record shows that: (1) only fists and feet were used in the beating; (2) defendants were provoked by Ortiz's fighting words; (3) alcohol was involved; and (4) there was a size discrepancy in that Ortiz was 5 feet 11 inches and 200 pounds but defendant was only 5 feet 7 inches and 160 pounds. Defendant contends that this evidence supported the inference that he acted recklessly.

¶ 55 The State contends that the evidence makes it clear that defendant's actions were not reckless and does not support the suggestion that when defendant kicked Ortiz in the head, he was only thinking he *might* cause serious bodily harm to Ortiz and ignored the risk. Rather, the State argues, it was clear from the evidence that defendant was *practically certain* that Ortiz would suffer great bodily harm, or death, when he kicked him in the head after Ortiz was knocked out and lay motionless on the ground. The State argues that an involuntary manslaughter instruction was not warranted as shown by "a simple viewing of

-9-

the evidence introduced at trial."

¶ 56    The State first notes that the size and strength of Ortiz compared to the size and strength of Thomas and defendant does not show that defendant acted recklessly. Ortiz was 50 years old and so intoxicated, with a blood alcohol level of 0.271 and stumbling, that it is inconceivable that it went unnoticed. Thomas was a 16-year-old professional boxer, and defendant was 20 years old and in good physical condition. The State asserts that the disparity in age and physical condition between Ortiz and defendant and Thomas does not indicate recklessness on the part of defendant.

¶ 57    The State further contends that the nature of the incident and the severity of Ortiz's injuries do not support a conclusion of reckless behavior. Ortiz's injuries show the severity of the beating. Ortiz's injuries support the conclusion that when defendant intentionally kicked Ortiz in the head after Thomas, a professional boxer, had punched Ortiz about the head several times, defendant did not act recklessly. The postmortem examination revealed he suffered multiple wounds to his face and that all but two of the wounds were to his face. Moreover, the wound to the top of his head exposed the underlying skull because the tissue was torn all the way down to the skull. In addition to the severe external injuries, Ortiz's internal injuries were significant. He sustained (1) several subgaleal hemorrhages, (2) a fracture in the frontal bone of the skull, which is very strong bone that makes a fracture very difficult to sustain, and (3) significant swelling of the brain. According to the expert forensic pathologist's testimony, the injuries were not caused when Ortiz fell to the ground after being punched by Thomas. The evidence also showed that, after defendant kicked Ortiz, there was so much blood on defendant's legs and shoelaces that he had to wash his legs and discard his shoelaces in the trash. These surrounding circumstances show the severity of the beating and injuries, and show that defendant knew that his acts created a strong probability of great bodily harm or death.

¶ 58    As the State also notes, it is of great significance that the evidence showed that Ortiz, at most, tried to punch Thomas during Thomas's initial attack. Ortiz never made any contact with Thomas and never tried to hit defendant. As defendant kicked Ortiz, he was lying motionless and "knocked out" on the ground.

¶ 59    Defendant, citing *People v. Cannon*, 49 Ill. 2d 162 (1971), notes that "there is a strong inference of knowledge or intent when a defendant shoots a gun into a crowd." He argues, however, that "the same inference is not so easily made when a death occurs as a result of a weaponless fight only involving the throwing of fists and kicking of feet." The cases cited by defendant, however, are factually distinguishable.

¶ 60    In *People v. DiVincenzo*, 183 Ill. 2d 239 (1998), the defendant was 18 years old. He did not like the victim because he had dated defendant's girlfriend several years before. Defendant confronted the victim because he believed he was staring at him. Although defendant and victim engaged in a weaponless fight, they were of the same general size and strength. There was evidence of mutual combat. Also, although the defendant punched the victim and knocked him to the ground, there was a dispute as to whether defendant kicked the victim. One eyewitness testified that the defendant kicked the victim once in the head while he was lying on the ground. Moreover, the medical examiner testified that the cause

-10-

of death was a torn cerebral artery, but that this type of injury was a rare phenomenon. Additionally, the defendant presented two experts. One expert opined that the victim's brain hemorrhage was caused by an aneurysm, and not a torn cerebral artery. The defendant's other expert opined that a minimal amount of force was required to fracture the jaw and that a blow to the jaw did not usually cause cerebral bleeding. In the instant case, Ortiz's skull was fractured and the testimony was that the bone that was fractured was strong and not easily broken. The subsequent injury, including the brain swelling, was not a "rare" phenomenon. Ortiz died from cranial cerebral injuries due to the beating. Unlike the victim in DiVincenzo, Ortiz did not fight back, and Ortiz was intoxicated. He was not the same age as the defendant. Ortiz was 50 years old while defendant was 21 years old. Thomas was 16 years old.

¶ 61     The case of *People v. Tainter*, 304 Ill. App. 3d 847 (1999), is also inapposite. In *Tainter*, the defendant was in a jealous and drunken rage. Notably, although the defendant punched and kicked the victim resulting in a broken jawbone, the victim "was able to get up, walk home, wash her face and remained ambulatory for several days." *Id.* at 851. She died from a bacterial infection related to the broken jaw. *Id.* The *Tainter* court concluded that the lesser offense instruction was warranted "given defendant's testimony that suggested the beating was part of a jealous rage, as well as the unusual final cause of death." *Id*. Here there was no similar testimony as to defendant's state of mind and Ortiz's injuries were not unusual but, rather, cranial cerebral injuries due to blunt head trauma from the assault.

¶ 62     *People v. Jones*, 404 Ill. App. 3d 734 (2010), did not involve jury instructions. Defendant argues that the beating in *Jones* "was without question more brutal and merciless than that of the current case." Nonetheless, the *Jones* court concluded that the defendant's actions were inconsistent with the mental state for murder. *Jones* is factually distinguishable. The victim in Jones was not beaten to death; none of the abrasions, lacerations, or bruises caused his death. Rather, the victim died of asphyxia due to compression of the neck. The *Jones* court found it significant that the defendant asphyxiated the victim with his foot and not his hands. The court found the size disparity between the victim and the defendant was significant. Defendant weighed 240 pounds and the victim weighed 370 pounds. The court concluded that the defendant would have applied pressure with his foot in an attempt to simply "hold" the victim down. The court also found that there was nothing in the record showing that the defendant would have known that applying a certain amount of pressure to the neck, and not the jugular vein, for one minute would have been enough to asphyxiate the victim. *Jones* has no application to the facts of this case involving the beating to death of a person. Although the defendant in *Jones* may have disregarded the risk of asphyxiation as he held down the victim with a foot, the facts here involve kicking a person in the head after that person had just been knocked unconscious after he sustained blows to the head inflicted by a professional boxer.

¶ 63     In sum, there was no evidence in the record which indicated that defendant acted recklessly and was guilty only of consciously disregarding a substantial and unjustifiable risk in kicking the victim in the head after he had been punched several times, knocked to the ground, and lay motionless. Defendant's mental state, based on the surrounding circumstances in the present case, was the mental state required for murder: he knew his acts

created a "strong probability of death or great bodily harm." 720 ILCS 5/9-1(a)(2) (West 2008). The trial court did not abuse its discretion in denying defendant's request for an instruction on involuntary manslaughter.

¶ 64                        Use of Defendant's Alleged Nickname

¶ 65    Defendant next argues that the excessive and improper use of defendant's nickname, "Kill Bill," caused substantial prejudice depriving him of a fair trial. The trial court permitted the introduction of the nickname "Kill Bill" for the limited purpose of identification. Defendant argues that the State took this "as license to antagonistically demonize [him] by branding him as a gangbanger with a predisposition for violence and murder." Defendant notes that the State referred to him as "Kill Bill" over 90 times during the trial, with 39 of these references occurring during closing argument.

¶ 66    "Generally, there is no impropriety in referring to a defendant by his or her nickname." *People v. Murillo*, 225 Ill. App. 3d 286, 294 (1992). However, "ordinary considerations of fair play would dictate that the use of a nickname which has a pejorative connotation should be permitted sparingly, only if there is a showing of necessity for its use." *Id*. at 294. "But even when this is the case, it is not improper to allow a defendant to be referred to by his nickname if witnesses knew and identified defendant by that name." *People v. Salgado*, 287 Ill. App. 3d 432, 445 (1997).

¶ 67    The State correctly notes that defendant has forfeited review of this error by both failing to object at trial and failing to raise the issue in his posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (to preserve an alleged error for review, both an objection at trial and a written posttrial motion raising the issue are necessary). Nonetheless, the plain-error rule bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved claims of error in specific circumstances. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). A reviewing court can consider a forfeited error where:

        "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Sargent*, 239 Ill. 2d 166, 189 (2010).

A defendant bears the burden of persuasion under each prong of the plain-error test. *People v. Lewis*, 234 Ill. 2d 32, 43 (2009). Defendant, however, did not file a reply brief and did not address the forfeiture issue.

¶ 68    While we certainly do not condone the State's use of defendant's nickname in those instances where it was unnecessary to establish his identity, we do not believe the State's conduct rose to the level of plain error. The evidence was not closely balanced and defendant could not sustain his burden under the first prong of the plain-error rule.

¶ 69    Defendant also could not establish plain error under the second prong. "Under the second prong of plain-error review, prejudice to the defendant is presumed because of the importance of the right involved, regardless of the strength of the evidence. [Citation.]"

(Internal quotation marks omitted.) *People v. Thompson*, 238 Ill. 2d 598, 613-14 (2010). The Illinois Supreme Court has "equated the second prong of plain-error review with structural error." *Id*. (citing *People v. Glasper*, 234 Ill. 2d 173, 197-98 (2009)). "An error is typically designated as structural only if it necessarily renders a criminal trial fundamentally unfair or an unreliable means of determining guilt or innocence." *Thompson,* 238 Ill. 2d at 609; see also *People v. Cosmano*, 2011 IL App (1st) 101196, ¶ 78 ("Error under the second prong of plain error analysis has been equated with structural error, meaning that automatic reversal is only required where an error is deemed to be a systemic error that serves to 'erode the integrity of the judicial process and undermine the fairness of the defendant's trial.' " (quoting *Glasper*, 234 Ill. 2d at 197-98)). Here, defendant has failed to show that the use of his nickname, even if excessive, constituted a "structural" error.

¶ 70                                            CONCLUSION

¶ 71        In accordance with the foregoing, we conclude that the trial court did not abuse its discretion in denying defendant's request for a jury instruction on involuntary manslaughter, and he has failed to show he was denied his right to a fair trial as a result of the State's excessive use of his nickname of "Kill Bill." We affirm the judgment of the circuit court of Cook County.

¶ 72        Affirmed.