# Illinois Official Reports

## Appellate Court

---

### *People v. Castillo*, 2018 IL App (1st) 153147

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHNNY CASTILLO, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-15-3147 |
| Filed | December 18, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-21352; the Hon. Timothy Joseph Joyce, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Bryon M. Reina, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Annette Collins, and Brenda K. Gibbs, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE MASON delivered the judgment of the court, with opinion.<br>Justices Pucinski and Hyman concurred in the judgment and opinion. |

**OPINION**

¶ 1    This first degree murder case arose from defendant Jonny Castillo's and codefendant Christopher Rodriguez's[1] brutal beating of William Jimenez, who sustained severe brain injuries. After the June 26, 1998, beating, Jimenez lived for almost 13 years in a semicomatose state until his death on March 26, 2011. After Jimenez died, Castillo and Rodriguez were charged with first degree murder and felony murder predicated on robbery. Following a separate but simultaneous bench trial, Castillo was convicted of first degree murder and sentenced to 20 years' imprisonment. He was acquitted of the felony murder charge. Castillo appeals, claiming that his first degree murder conviction should be reduced to involuntary manslaughter because the State failed to prove that he kicked and punched Jimenez knowing his conduct created a strong probability of death or great bodily harm. Castillo also claims that the trial court improperly considered against him Rodriguez's incriminating statement that they "stomped" Jimenez in finding that Castillo had the requisite knowing mental state. We affirm Castillo's first degree murder conviction because (i) there was sufficient evidence establishing Castillo's knowing conduct when he severely beat Jimenez and (ii) the trial court only considered admissible evidence.

¶ 2                                    I. Background

¶ 3    Jacqueline and Jimenez were married in 1984 and lived on Claremont Street in Chicago. Jimenez was also known by his nickname, "Rico." In June 1998, Jimenez was 34 years old, was a member of the Latin Kings gang, and had a drinking problem. Castillo was 19 years old, and Rodriguez was 17 years old. Castillo was a member of the Gangster Disciples gang, and Rodriguez was a member of the Spanish Cobras gang. The Spanish Cobras and Gangster Disciples were rival gangs to the Latin Kings.

¶ 4    Around noon on June 26, 1998, Jacqueline left home to go to work, and Jimenez left at the same time to visit his mother, who lived near 24th Street and Spaulding Avenue in Chicago.

¶ 5    In the evening hours of June 26, 1998, Victor Denis was near the corner of Claremont Avenue and Taylor Street hanging out with Rodriguez, Castillo, and Castillo's father. Denis saw Castillo earlier in the day, and Castillo had been drinking. Eventually Jimenez approached the group. Jimenez exchanged words with Rodriguez and Castillo about gangs, and the argument got heated. Jimenez ran off. Rodriguez and Castillo chased Jimenez and caught up to him about two houses down the street. Rodriguez then threw Jimenez to the ground, and Rodriguez and Castillo started kicking him. Jimenez was lying on the ground not fighting back. Castillo was kicking Jimenez in the abdomen. At some point, Rodriguez and Castillo stopped kicking Jimenez, and they ran away. Denis did not see Rodriguez or Castillo go through Jimenez's pockets, try to take anything from him, or put anything in their pockets as they ran away. Denis saw Jimenez lying on the ground, not moving, not speaking, and not making any noises; he did not cry out for help. Denis did not see Rodriguez, Castillo, or Jimenez with any weapons, such as guns, knives, or bats. Denis was unsure if the beating lasted over a minute.

---

[1]Rodriguez is not a party to this appeal.

¶ 6     Later that evening, James Crejan saw Rodriguez, his nephew, come around the corner of Taylor and Claremont moving pretty fast, but not necessarily running. Crejan noticed a little bit of blood on Rodriguez's pants and shoes. Concerned that his nephew might be injured, Crejan caught up to Rodriguez and asked if everything was okay. Rodriguez responded, "we f*** him up." Crejan asked, "who" and Rodriguez responded, "just the flake." Crejan understood "the flake" to mean a rival gang member, and Rico was the only rival gang member in the neighborhood. Like Rodriguez, Crejan was a member of the Spanish Cobras. Crejan told Rodriguez to "go home and wash up." Rodriguez left, and Crejan went back to the corner.

¶ 7     Within the next day or two, Crejan asked Rodriguez what had happened on June 26. Rodriguez said that he and Castillo were walking down Claremont minding their own business when Rico started harassing and intimidating them, throwing up gang signs. Rodriguez and Castillo started walking away, but Rico came off the porch and kept following them until he got dangerously close, and then a serious fight broke out. Rico ran away, and Rodriguez and Castillo caught up to Rico and beat him mostly with their hands, elbows, knees, and feet. Rodriguez said they "stomped" Rico, which Crejan interpreted to mean "that he beat him down."

¶ 8     Louie Coletta lived at 918 South Claremont with his family. In the later evening hours of June 26, 1998, Coletta parked his car and started walking toward his home when he saw a person lying on the sidewalk, about 10 feet from his front gate. The individual was not moving. Coletta went inside and told his aunt what he saw. Coletta and his aunt shone a light from their porch and saw the individual lying on the sidewalk was a man. He was not moving but was making a faint noise, a gurgling sound. Coletta's aunt called 911.

¶ 9     At about 11:30 p.m., Officer David Striegel of the Chicago Police Department responded to the call. When he arrived at the scene, he saw a man lying on the sidewalk who had blood on his head, face, and body. He could not communicate with the man, who was not speaking, making any noise, or moving. The man's pants pockets were pulled inside out. Officer Striegel could not determine the man's identity. He called for an ambulance, and the man was transported to Mount Sinai Hospital.

¶ 10    Some time after midnight, Detective Robert Fujara of the Chicago Police Department went to Mount Sinai to investigate an unidentified male who was found on the street at 918 South Claremont. Detective Fujara could not determine the man's identity because he was in a coma.

¶ 11    Even though Jimenez did not come home that night and Jacqueline determined that her husband was not at his mother's house, Jacqueline did not fill out a missing persons report because Jimenez on occasion would not come home. After a couple of days, in an attempt to locate him, Jacqueline called the police to find out whether Jimenez had been arrested. On June 30, Jacqueline received a telephone call instructing her to go to Mount Sinai. When Jacqueline got to the hospital, she saw Jimenez in a room on a ventilator. Jacqueline contacted Detective Fujara and identified her husband as the man found at 918 South Claremont. Detective Fujara then attempted to locate the offenders. A few weeks later on July 22, 1998, Jacqueline again contacted Detective Fujara and provided names of individuals who had information relating to the attack on her husband.

¶ 12    The next day, based on the information Jacqueline gave him, Detective Fujara spoke to Michelle Crejan, who was Rodriguez's legal guardian and Crejan's sister. Michelle told Detective Fujara that Rodriguez committed the battery, and she also gave him Castillo's name. The same day, Detective Fujara questioned Rodriguez and Castillo. Based on his questioning,

Detective Fujara arrested Castillo at 12:45 p.m. Castillo gave a statement to Assistant State's Attorney Stan Gonsalves at 11:10 p.m. ASA Gonsalves prepared a written summary of Castillo's statement, which Castillo read and signed. Castillo's summarized statement states in relevant part:

> "This statement taken regarding the aggravated battery of William Jimenez which occurred on June 26, 1998, at 918 South Claremont at approximately 10:00 p.m.
>
> * * *
>
> John states that on June 26th, 1998, at around 10:00 o'clock at night, he was hanging out on the corner of Taylor and Claremont with his friend Christopher Rodriguez. John states that he *** has known Christopher since they were little kids. John states that his father was standing on the corner with them but that he left with his friends. John states that he—that his friend Christopher is a member of the Cobra street gang.
>
> John states that while he and Christopher were hanging out, some Hispanic guy came over and started talking to Christopher. John states that the Hispanic guy started arguing and he had heard the Hispanic guy say that he is a Latin King. John states that the Latin Kings and Cobras are rival gangs. John states that Christopher continued to argue with the guy about gangs and that the Hispanic guy started to run away northbound on Claremont. John states that Christopher chased the guy and he followed Christopher. John states that Christopher caught up with the Hispanic guy, grabbed him and threw him to the ground. John states that this Hispanic guy was lying face down on the ground on the sidewalk.
>
> John states that Christopher started kicking the Hispanic guy on the head numerous times. John states that as Christopher was kicking the guy, he came over and punched the guy in the sides. John states he also kicked the guy as he was [lying] on the ground.
>
> John states that he saw that the Hispanic guy was not moving so he stopped kicking him. John states that Christopher continuing kicking the guy in the head. John states that as Christopher was kicking the guy, he walked away.
>
> John states that the Hispanic guy that he and Christopher kicked and punched never had a gun or a knife or any type of weapon on him at any time."

¶ 13        Rodriguez also gave a statement, which incriminated Castillo. Rodriguez stated that he and Castillo got into an argument with Jimenez over gangs. Jimenez ran away, and they chased him. After Rodriguez caught up to Jimenez, he tripped Jimenez, who fell facedown on the sidewalk. As Jimenez was lying on the sidewalk, Rodriguez kicked Jimenez in the head a number of times, and Castillo kicked Jimenez all over his body. Rodriguez and Castillo stopped kicking Jimenez and walked away. Jimenez was not moving and was still lying facedown on the sidewalk.

¶ 14        Castillo was charged in 1998 with aggravated battery and attempted murder. Castillo was found not guilty of attempted murder but guilty of aggravated battery. On October 25, 1999, Castillo was sentenced to five years' imprisonment, which he served.

¶ 15        Jimenez lived for almost 13 years after the beating. During that time, Jimenez was in a semicomatose state, had a feeding tube and catheter, and received oxygen from a tracheotomy tube. When Jimenez was not hospitalized or in a rehabilitation facility, he lived with Jacqueline, who took care of him with help from her family, friends, and visits from a nurse or

doctor. In March 2011, Jimenez returned to the hospital and died on March 26, 2011. From June 26, 1998, until his death, Jimenez never regained consciousness and could not speak with Jacqueline, though she believed he communicated by blinking his eyes.

¶ 16    After Jimenez died, Dr. Adrienne Segovia of the Cook County Medical Examiner's Office performed an autopsy and reviewed a computed tomography scan from June 26, 1998, which showed blunt head trauma, extensive scalp swelling, and hematoma. Jimenez also suffered from a shearing injury, which arises from blunt head trauma and causes the cells in the brain to shear apart, disrupting the communication between the cells in the brain. When Jimenez was admitted to Mount Sinai in June 1998, his blood alcohol level was 0.243, more than three times the legal limit to drive. Dr. Segovia explained that alcohol consumption can prolong the time that it takes for internal bleeding to clot. And to some degree, alcohol would affect an individual's balance, causing him or her to stagger or fall down. Dr. Segovia noted that the emergency room report for June 1998 only mentioned swelling and made no mention of any external wounds. Dr. Segovia opined that Jimenez died as a result of cerebral injuries due to an assault and the manner of death was homicide. According to Dr. Segovia, Jimenez never substantially recovered from the injuries he sustained in 1998.

¶ 17    Castillo and Rodriguez were charged with first degree murder and felony murder predicated on the robbery of Jimenez. Based on the incriminating statements each made against the other, the trial court granted Castillo's and Rodriguez's request for separate but simultaneous bench trials. In granting the motion, the trial court stated that it would hear the cases simultaneously but would "of course be cognizant of what evidence is properly admissible against each defendant and which evidence is not admissible against each defendant." Castillo's and Rodriguez's separate counsel each examined the State's witnesses and presented opening statements and closing arguments.

¶ 18    During his trial testimony, Crejan suffered a seizure near the end of the State's direct examination, so defense counsel was unable to conduct cross-examination. The parties later stipulated that Crejan would have testified that "Rodriguez told him that they were already drinking, they had just gotten out of work, they got paid and they were drinking. Mr. Jimenez was already drunk and they beat him up." The trial court asked Castillo's counsel whether he wanted the stipulation considered on behalf of Castillo, and he responded, "No." The trial court stated, "Then it won't be." The trial court further asked Castillo's counsel whether there was any cross-examination that Castillo wished to pursue regarding Crejan's interrupted trial testimony, and counsel answered, "No."

¶ 19    The trial court allowed Detective Fujara to read the written statement that Castillo gave in his presence but explicitly stated that Castillo's statement would not be considered as to Rodriguez because of the motion for severance. And when the State moved to admit Castillo's and Rodriguez's written statements into evidence, the trial court again explicitly stated that each defendant's statements would not be admitted against the other.

¶ 20    At the close of the State's case, the trial court granted Castillo's and Rodriguez's motion for a directed finding on the felony murder charge, determining that the State failed to offer sufficient evidence demonstrating that codefendants robbed Jimenez at the time of the beating.

¶ 21    During closing arguments, the State reiterated that use of Castillo's and Rodriguez's written statements would be limited to his own case, respectively. The State argued that the beating did not involve just fists but "it was kicking and it was stomping." The State continued that Jimenez never rolled over during the kicking and stomping. The State also referred to

Rodriguez's statement that "they f*** up the flake and then later told Mr. Cre[j]an that they stomped on the victim." Rodriguez's counsel highlighted the absence of external injuries noting that "it's not like they stomped him and there was a lot of blood and it got all over Chris'[s] clothing and they are like oh, look, we are really creating some terrible, huge damage here." Rodriguez's counsel likened the beating to a fight. Castillo's counsel argued that he was not accountable for Rodriguez's actions and there was no outward manifestation of any injuries to Jimenez when Castillo and Rodriguez beat him. In rebuttal, the State indicated that it would probably jump back and forth between both defendants. The State argued that "just because Castillo didn't stomp him in the head, doesn't mean when he was working with his partner in concert to beat this man, that he's not accountable." The State also argued that "[t]he stomping, the kicking, the injury. It was intentional."

¶ 22     The trial court found that Castillo and Rodriguez acted in concert and Castillo was accountable for Rodriguez's actions. In rendering its finding, the trial court stated "[b]ecause the fact that he was beaten and kicked and stomped, Mr. Rodriguez uses the word stomp when he speaks to Mr. Crejan and talks about how we caught him. Which as [the State] pointed out, certainly is not indicative or supportive of a fight." The trial court also noted that Castillo was 19 and Rodriguez 17 at the time of the beating and that it could "fully appreciate this probably took place whatever the duration was, before Mr. Castillo and Mr. Rodriguez could think it through. And not thinking it through is part of what's criminal." The trial court found both Castillo and Rodriguez guilty of first degree murder and sentenced both of them to the minimum 20 years' imprisonment. The trial court denied Castillo's motion for a new trial, in which he argued that the evidence was insufficient to prove that he had the requisite mental state to support a conviction for first degree murder. Castillo timely appealed.

¶ 23                                              II. Analysis

¶ 24     Castillo first challenges the sufficiency of the evidence, claiming that the State failed to prove beyond a reasonable doubt that he knew there was a strong probability of death or great bodily harm when he beat Jimenez. Castillo argues that his conviction for first degree murder should be reduced to involuntary manslaughter because the evidence demonstrated that he acted recklessly and not knowingly.

¶ 25     When reviewing a sufficiency of the evidence claim, the appropriate inquiry is whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis omitted.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Gray*, 2017 IL 120958, ¶ 35. In other words, a reviewing court will reverse a conviction only if the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *Gray*, 2017 IL 120958, ¶ 35.

¶ 26     A defendant commits first degree murder when his acts cause death to another and he (i) intends to kill or do great bodily harm or knows his acts will cause death, (ii) knows his acts create a strong probability of death or great bodily harm, or (iii) attempts or commits a forcible felony other than second degree murder. 720 ILCS 5/9-1(a) (West 2012). Accordingly, a defendant may commit first degree murder in three different ways: intentionally, knowingly, or felony murder. *People v. Coats*, 2018 IL 121926, ¶ 22. At issue here is whether Castillo knowingly committed first degree murder. An individual acts with knowledge when he is consciously aware that his conduct is practically certain to cause a particular result. *People v.*

*McDonald*, 2016 IL 118882, ¶ 51 (citing 720 ILCS 5/4-5 (West 2014)). A defendant's knowledge is generally established by circumstantial evidence rather than direct proof. *People v. DiVincenzo*, 183 Ill. 2d 239, 252 (1998), *abrogated on other grounds by McDonald*, 2016 IL 118882; *People v. Bui*, 381 Ill. App. 3d 397, 419 (2008).

¶ 27        In contrast, a defendant commits involuntary manslaughter when he unintentionally, but recklessly, performs an act that is likely to cause death or great bodily harm to another. 720 ILCS 5/9-3 (West 2012); *McDonald*, 2016 IL 118882, ¶ 50. Reckless conduct occurs when an individual consciously disregards a substantial and unjustifiable risk that a result will follow and such disregard is a gross deviation from the standard of care that a reasonable person would exercise under the same circumstances. 720 ILCS 5/4-6 (West 2012); *McDonald*, 2016 IL 118882, ¶ 50.

¶ 28        The defendant's mental state differentiates first degree murder from involuntary manslaughter. *McDonald*, 2016 IL 118882, ¶ 51. In particular, "[i]nvoluntary manslaughter requires a less culpable mental state [(recklessness)] than first degree murder [(intentionally or knowingly)]." *People v. Robinson*, 232 Ill. 2d 98, 105 (2008) (citing *DiVincenzo*, 183 Ill. 2d at 249). Whether the defendant is guilty of first degree murder or involuntary manslaughter is a question for the trier of fact. *DiVincenzo*, 183 Ill. 2d at 253; *People v. Leach*, 405 Ill. App. 3d 297, 312 (2010).

¶ 29        After viewing the evidence in the light most favorable to the State, we find that a rational trier of fact could have found that Castillo's conduct constituted knowing first degree murder. In his own words that were memorialized in his written statement, Castillo admitted that he, along with Rodriguez, chased Jimenez after Jimenez ran off following a heated exchange of words. Castillo watched Rodriguez grab Jimenez and throw him to the ground, where Jimenez lay facedown on the sidewalk. Castillo saw Rodriguez kick Jimenez in the head numerous times, and Castillo simultaneously punched Jimenez in his side and kicked him as he continued to lie facedown on the ground. It was only after Castillo saw that Jimenez was not moving that he stopped kicking him, but he again watched as Rodriguez continued to kick Jimenez in the head. Denis's eyewitness account was substantially consistent with Castillo's written statement. And less than two hours after the beating, Coletta and Officer Striegel both observed Jimenez lying in the street not moving and not speaking. Likewise, Detective Fujara could not communicate with Jimenez the night of the beating because he was in a coma. Based on these witnesses' observations, there was sufficient evidence to find that Castillo acted knowingly when he and Rodriguez repeatedly beat Jimenez to the point he could not move or speak. Moreover, Castillo's brutal beating of Jimenez was supported by the medical evidence, which established that Jimenez suffered from blunt head trauma and serious brain injuries at the time of the beating. In particular, the shearing injury sustained by Jimenez, caused by blunt force sufficient to cause the cells of his brain to permanently shear apart, supports the trial court's finding that Castillo's conduct was intentional.

¶ 30        Castillo urges this court to find that his conduct in beating Jimenez was reckless, but to do so would require this court to ignore the evidence that Jimenez never displayed a weapon during the heated argument before he ran away, only to be chased by Castillo and Rodriguez, thrown to the ground where he lay facedown—defenseless and motionless—while enduring repeated punches and kicks by both Castillo and Rodriguez in the head and abdomen. Even after Castillo noticed that Jimenez was motionless, he left him on the sidewalk unable to get away and watched Rodriguez continue kicking Jimenez in the head. There was no evidence

that Jimenez ever fought back, in any manner at any time, or even moved after being thrown facedown on the sidewalk.

¶ 31    In any event, Castillo claims that bare-handed blows are never sufficient to find the requisite knowing mental state for first degree murder. Although a bare-fisted punch would generally be insufficient to find knowing first degree murder (*People v. Brackett*, 117 Ill. 2d 170, 180 (1987)), Castillo repeatedly punched and kicked Jimenez with his feet while he knew Rodriguez was simultaneously and repeatedly kicking Jimenez in the head. See *DiVincenzo*, 183 Ill. 2d at 254 (punching and kicking the victim may be sufficient to find the defendant guilty of murder); *People v. Castillo*, 2012 IL App (1st) 110668, ¶ 63 (the defendant's mental state supported a finding of murder and not recklessness where the defendant punched the victim several times, knocked him to the ground, and kicked him in the head while he was lying motionless). Castillo cannot credibly claim that he did not know simultaneous and repeated kicks and punches to Jimenez's head and body after being thrown to the ground would create a strong probability of death or great bodily harm.

¶ 32    Certainly Castillo could not have foreseen that Jimenez would unfortunately live in a semicomatose state for close to 13 years following the beating, but it was foreseeable and certain that Castillo's and Rodriguez's coordinated blows to Jimenez's head and body after he was thrown to the ground would naturally cause great bodily harm or death. Likewise, Jimenez's high blood alcohol level on the day of the beating may have inhibited his body's ability to clot, but the medical evidence established that he died from cerebral injuries due to assault, not intoxication. And Castillo's voluntary consumption of alcohol on that day cannot reduce his conviction from knowing first degree murder to involuntary manslaughter. 720 ILCS 5/6-3 (West 2012); *People v. Jackson*, 2017 IL App (1st) 142879, ¶ 87 (Mason, J., dissenting).

¶ 33    Castillo also contends that the trial court misconstrued the record in finding that he beat Jimenez unconscious. Castillo claims that Jimenez could not have been unconscious after the beating because he was found at 918 South Claremont, while the beating occurred about three houses down. From this, Castillo infers that Jimenez must have been conscious and moved from one location to the other. But such an inference is not reasonable based on the evidence in the record that Jimenez was not moving during the beating, and any inference from the evidence must be construed in favor of the State, not Castillo. *People v. Baskerville*, 2012 IL 111056, ¶ 31. Moreover, Denis's description of where the incident occurred was clearly an approximation intended not to identify the exact location of the beating but to demonstrate how far Jimenez ran before Rodriguez caught up to him and threw him to the ground. Alternatively, Castillo theorizes that Jimenez became unconscious from hitting his head on the sidewalk after Rodriguez threw him to the ground. Castillo argues that the evidence supports a finding that Jimenez's cause of death was the blunt force trauma he sustained after Rodriguez threw him to the ground, which he had no part of, and not the beating. But Castillo again improperly draws an inference from the evidence in the light most favorable to himself and not the State. *Id.* And a trial court is not required to disregard inferences that flow normally from the evidence or seek out all possible explanations consistent with innocence and raise those explanations to a level of reasonable doubt. *People v. Hardman*, 2017 IL 121453, ¶ 37; *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60; *In re Omar F.*, 2017 IL App (1st) 171073, ¶ 38; *People v. Murphy*, 2017 IL App (1st) 142092, ¶ 11. In any event, whether Jimenez was unconscious before or after the beating does not alter the fact that he and Rodriguez beat Jimenez as he lay motionless on the ground,

including kicking him in the head, knowing their conduct created a strong probability of death or great bodily harm.

¶ 34 Likewise, the lack of extensive external injuries cannot reduce Castillo's conduct from knowing to reckless. See *People v. Bishop*, 218 Ill. 2d 232, 250 (2006); *People v. Johnson*, 2015 IL App (1st) 123249, ¶ 31 (an injury may be inferred based upon circumstantial evidence in light of common experience). Castillo completely discredits the readily accepted notion that internal injuries can be just as lethal as external injuries, perhaps even more so. And the medical evidence was clear that Jimenez suffered severe brain injuries from the beating. Even though no external wounds were noted on the emergency room report, Crejan saw blood on Rodriguez's clothes immediately after the beating, and Officer Striegel saw blood on Jimenez's head, face, and body when he arrived at the scene, which gives rise to the reasonable inference that Jimenez visibly bled from the beating. Moreover, even after Castillo saw Rodriguez grab and throw Jimenez to the ground and start kicking him in the head, he decided to join in the beating by punching Jimenez in the abdomen and kicking him, stopping only when he noticed that Jimenez was not moving. Because Castillo stopped beating Jimenez when he noticed Jimenez was not moving, the reasonable inference was that Castillo knew Jimenez suffered grave injuries and there was no need to continue beating him, as the objective to inflict serious bodily harm or death had been achieved.

¶ 35 Castillo similarly argues that the trial court misconstrued the evidence in the record when it stated that the beating lasted two minutes even though Denis was unsure if the beating lasted over a minute. Regardless of whether the beating lasted one minute or two, the scenario here was not a one-on-one fight but two individuals simultaneously delivering repeated blows to another who lay facedown on the sidewalk not fighting back or moving. Under this scenario, it cannot be reasonably disputed that Castillo knew his conduct would cause great bodily harm or death. Moreover, duration of the beating is generally a factor[2] courts consider when deciding whether a defendant's conduct was reckless, but consideration of that factor is not dispositive where, as here, the nature of the killing, shown by either multiple wounds or the victim's defenselessness, demonstrated that the defendant did not act recklessly. *DiVincenzo*, 183 Ill. 2d at 251.

¶ 36 Castillo further contends that the trial court misapplied the required mental state in finding knowing first degree murder as demonstrated by its comment that "I can fully appreciate this probably took place whatever the duration was, before Mr. Castillo and Mr. Rodriguez could think it through. And not thinking things through is part of what's criminal." Castillo interprets the trial court's comment to mean that he acted recklessly by "not thinking things through." But Castillo misconstrues the trial court's statement and reads it in isolation. The trial court continued by stating that Castillo's conduct in kicking Jimenez "was the result of purposeful actions [engineered] by an intent to inflict great bodily harm. Which is precisely what 9-1(a)(2) of the criminal code [(knowing murder)] *** speaks to." When the trial court's findings are read in totality, it is clear that the court had in mind the required mental state for knowing first degree murder and correctly determined that Castillo did not act recklessly. And there is no

---

[2]The factors courts generally consider when deciding whether a defendant's conduct was reckless include (i) the disparity in size between the defendant and the victim, (ii) the brutality and duration of the beating and the severity of the victim's injuries, and (iii) whether the defendant used his or her bare fists or a weapon. *DiVincenzo*, 183 Ill. 2d at 251.

merit to Castillo's claim that he and Rodriguez were teenagers (19 and 17 years old, respectively) provoked by 34-year-old Jimenez when Jimenez started throwing up gang signs and got dangerously close to them. Mere words and gestures are insufficient to constitute serious provocation. *People v. Blackwell*, 171 Ill. 2d 338, 358 (1996); *People v. Camacho*, 2016 IL App (1st) 140604, ¶ 37.

¶ 37 Castillo faults the State for not distinguishing *People v. Lengyel*, 2015 IL App (1st) 131022, and *People v. Jones*, 404 Ill. App. 3d 734 (2010), which he cited as support for finding his conduct was reckless and not knowing. But the State considered Castillo's reliance on those cases misplaced because, unlike here, the medical evidence in *Lengyel* and *Jones* showed that the beatings were not the cause of death, and the defendants could not have known that their conduct would have resulted in death. We agree with the State that *Lengyel* and *Jones* provide no support for Castillo's claim that his conduct was merely reckless. See *Lengyel*, 2015 IL App (1st) 131022, ¶¶ 27, 64 (blunt force trauma to victim's head was not the definitive cause of the victim's death, and the defendant acted recklessly when he disregarded the risk that his punches could spike victim's blood pressure leading to a stroke and death); *Jones*, 404 Ill. App. 3d at 747 (injuries from the fight not the cause of victim's death, and a lay person would not know that placing a foot on the soft tissue area of the neck applying 4.4 pounds of pressure to hold the victim down would lead to death).

¶ 38 In sum, the nature of the injuries that led to Jimenez's death belies any suggestion that Castillo's actions were reckless and not knowing, and the evidence demonstrating Castillo's knowing conduct was not so improbable, unsatisfactory, or inconclusive as to leave a reasonable doubt regarding his guilt. Consequently, the evidence was sufficient to prove Castillo guilty beyond a reasonable doubt of first degree murder.

¶ 39 Castillo also claims that the trial court improperly considered Rodriguez's incriminating statement, repeated by Crejan, that Rodriguez and Castillo "stomped" Jimenez and used that statement against Castillo to find that he knowingly committed first degree murder.

¶ 40 Castillo concedes that he forfeited review of this claim of error, but he urges review of his unpreserved claim under the plain error doctrine. The plain error doctrine allows a reviewing court to consider an unpreserved error when a clear and obvious error has occurred and either (i) the evidence was closely balanced or (ii) the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process. *People v. Staake*, 2017 IL 121755, ¶ 31 (citing *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007), citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)). But the predicate to a plain error analysis is the finding that an error occurred. *Id.* ¶ 33; *People v. Walker*, 232 Ill. 2d 113, 124 (2009); *People v. Space*, 2018 IL App (1st) 150922, ¶ 63. We need not engage in a plain error analysis here because no error occurred.

¶ 41 Castillo's and Rodriguez's basis for seeking severance was a *Bruton* violation. See *Bruton v. United States*, 391 U.S. 123, 135-36 (1968). During a joint trial, *Bruton* prohibits the prosecution's use of a statement made by a nontestifying codefendant that expressly implicates the other defendant in the crime. *People v. Ousley*, 235 Ill. 2d 299, 303 (2009) (citing *Bruton*, 391 U.S. at 137). Importantly, *Bruton* involved a jury, and not a bench trial, and a jury "cannot be expected to consider an inculpatory statement in determining the guilt or innocence of the declarant, then ignore that statement in determining the guilt or innocence of the declarant's codefendants." *Id.* at 310. But the same cannot be said in a bench trial where the presumption exists that a judge has considered only competent and proper evidence. *People v. Schmitt*, 131

Ill. 2d 128, 138 (1989). Indeed, when a judge in a bench trial is confronted with an incriminating statement by one codefendant in a separate but simultaneous bench trial, the court is presumed "capable of compartmentalizing its consideration of evidence." *Id.* at 137.

¶ 42 There is no basis here to find that the experienced trial judge improperly considered Rodriguez's incriminating statement against Castillo. When the trial court granted the severance, it clearly articulated that it would hear the cases simultaneously "but will of course be cognizant of what evidence is properly admissible against each defendant and which evidence is not admissible against each defendant." The trial court's ability to compartmentalize its consideration of the evidence was demonstrated when it repeatedly stated that each defendant's incriminating statements would not be used against the other. Likewise, the trial court specifically asked Castillo's attorney whether Crejan's stipulation would be admitted against Castillo, which further demonstrated its ability to separate the evidence. We refuse to presume that the trial judge simply forgot during Castillo's trial, which spanned over portions of three days, that he was conducting a separate but simultaneous trial, particularly given his and the State's repeated acknowledgement that certain evidence was only admissible against one defendant but not the other.

¶ 43 Contrary to Castillo's assertion, the trial court did not explicitly state that it considered Crejan's inadmissible statement as a basis to find Castillo guilty of first degree murder. See *People v. Williams*, 246 Ill. App. 3d 1025, 1033 (1993) (if the trial court explicitly states that it will not consider inadmissible evidence in a joint trial, and the record supports the judge's admonition, the defendant's claim that he was denied a fair trial must fail). Based on the record, the trial court's ultimate characterization of Castillo's conduct as "stomping" Jimenez was a fair characterization of the evidence. The mere fact that Rodriguez's statement to Crejan used the same relatively common word does not, standing alone, support the inference that the trial court considered this statement against Castillo. Consequently, nothing in the record demonstrates that the trial court improperly relied upon the inadmissible incriminating statement to find Castillo guilty of knowing first degree murder. Because there was no error, there can be no plain error. *Walker*, 232 Ill. 2d at 124; *People v. Smith*, 372 Ill. App. 3d 179, 181 (2007). Castillo's related claim that his trial counsel was ineffective because she did not object to the trial court's alleged consideration of Rodriguez's statement fails for the same reason. *People v. Polk*, 2014 IL App (1st) 122017, ¶ 29.

¶ 44 For the foregoing reasons, we affirm Castillo's conviction for first degree murder.

¶ 45 Affirmed.